# IN THE COURT OF APPEALS OF IOWA

No. 17-0435
Filed September 12, 2018

**SESSIONS L. HARPER,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.

_____

Appeal from the Iowa District Court for Webster County, Thomas J. Bice, Judge.

Sessions Harper appeals the denial of his application for postconviction relief. **AFFIRMED.**

Andrew J. Smith of Mack, Hansen, Gadd, Armstrong & Brown, PC, Storm Lake, for appellant.

Sessions L. Harper, Fort Madison, pro se.

Thomas J. Miller, Attorney General, and Kevin R. Cmelik, Assistant Attorney General, for appellee State.

Considered by Danilson, C.J., and Mullins and McDonald, JJ.

**MULLINS, Judge.**

"Sessions Harper raped me, tied me up, and set my house on fire." This nontestimonial dying declaration[1] by Holly Michael was a small piece of the insurmountable evidence that led to Harper's convictions of sexual abuse, kidnapping, murder, and arson—all in the first degree. After the supreme court affirmed Harper's convictions on direct appeal, Harper filed an application for postconviction relief (PCR), which was ultimately denied by the district court. Harper appeals the denial of his PCR application. In addition to his various pro se claims of ineffective assistance of counsel, he contends the district court erred in concluding his trial counsel did not render ineffective assistance of counsel in failing to object to an allegedly improper jury instruction on the crime of first-degree kidnapping and abused its discretion in declining to admit certain evidence in the PCR trial.

## I.    Background Facts and Proceedings

On the evening of Saturday, January 7, 2006, Holly Michael, Becky Sittig, Ashleigh Attig, and Harper hung out at Michael's house in Fort Dodge beginning at around 7:00 or 8:00 p.m.[2] From then until the early morning hours of January 8, the group drank alcohol, smoked marijuana, and consumed cocaine. The group left the residence to go to a nearby bar at which they arrived around 1:00 a.m. Video surveillance footage at the bar depicted Harper to have a shaved head and wearing a black jacket with a hood. They drank at the bar until around 1:40 a.m. then returned to Michael's house, where they consumed more alcohol and drugs.

---

[1] *See generally Harper v. State*, 770 N.W.2d 316 (Iowa 2009).
[2] Michael shared the residence with her mother, Anita, who was out of town at the time.

At some point after the group returned from the bar, Attig and Harper engaged in sexual intercourse on the floor in Michael's bedroom.[3] Attig testified, as was normally the case when she and Harper engaged in intercourse, Harper did not wear a condom.

Sittig, Attig, and Harper left Michael's house around 4:30 a.m. and returned to the home shared by Sittig and Attig. Sittig left the home to go to her mother's roughly ten minutes later. Harper left around the same time to retrieve something from his residence, which was just around the corner. He returned a short time later, dropped off the item he retrieved, and left again shortly thereafter. Harper made eight phone calls from his cell phone to the Michael residence after he departed from the party, at 4:28, 4:55, 4:58, 5:23, 5:32, 5:41, 5:42, and 6:35 a.m.

James and Michelle Leith live in the vicinity of the Michael residence. When James arrived home from work at around 8:00 a.m. on January 8, he saw a car he did not recognize parked in the street near his home, "a sporty-looking, red, four-door" car with a rear spoiler. James took a second look at the vehicle after he got out of his car and observed it to be an Oldsmobile. At about 9:10 a.m., as Michelle was leaving home to take her children to Sunday school, she noticed the red car parked in the street at the end of her driveway. When she returned about twenty minutes later, the vehicle was still there. At this point, Michelle observed a multicolored lei hanging from the car's rearview mirror. The Leiths observed the car drive away at around 9:40 a.m., but did not see who was driving it.

---

[3] Harper and Attig were romantically involved prior to these events. The two share a child.

Joey McDowell, a neighbor of the Leiths, also lives in the vicinity of the Michael residence. At around 8:00 a.m., McDowell observed a red car with a "wing" on the back parked on the street near her home. At about 9:30 or 9:40 a.m., McDowell looked out her front window and observed an African American male with a shaved head wearing a jacket with a hoodie underneath get in the car and drive away.

At or around 9:45 a.m., passers-by observed Michael's home to be on fire and called 911. Upon their arrival, firefighters entered the home to search for any occupants. After searching the main level, firefighters opened the basement door, which was initially blocked with a piece of furniture, and heard screaming. In the basement, firefighters found Michael lying face down on the floor, wrapped in a burning comforter, with her arms and legs bound with wire. Michael was transported from the basement to an ambulance on the scene. When placed in the ambulance, a paramedic poured saline on Michael to extinguish the smoldering materials attached to her body. The paramedic observed Michael was not wearing any clothing and had gray duct tape and brown telephone wire on her right wrist.

When Michael arrived in the emergency room, an x-ray technician heard Michael say, "Harper did it, Harper did it." A respiratory therapist heard Michael say, "Don't let him hurt me." Dr. Daniel Cole asked Michael what happened to her. Michael responded Sessions Harper raped her, tied her up, and set her house on fire. Dr. Cole asked Michael to repeat what she said, and Michael again stated Sessions Harper raped her, tied her up, and set her house on fire. Dr. Elizabeth Day questioned Michael if she knew who had done this to her. Michael responded, "Sessions Harper" and specified, "He tied me up, raped me, and left me in the

basement." Dr. Dan Warlick heard Michael state Sessions Harper raped her, tied her up, and set her house on fire. Due to the severity of her injuries, Michael was airlifted to Iowa City. When Michael's mother visited her in the hospital, Michael mouthed the word "Sessions" over and over again from her hospital bed. Michael suffered third- and fourth-degree burns to sixty percent of her body, some to the bone, and her arms had to be amputated. Michael ultimately died as a result of her injuries.

The day after the fire, McDowell read the newspaper, which included a written description and picture of Harper in connection with the fire at the Michael residence. McDowell thought the person she saw with the red car parked on the street near her home might have been Harper. McDowell approached James Leith, and the two spoke about their observations the previous morning. As a result of that discussion, James called the police.

Upon investigation of the scene, it was discovered that all of the smoke detectors in the home had been disabled. In the basement of the home, law enforcement found charred terry cloth on the floor, a gasoline can containing a small amount of gasoline with a charred paper towel wick sticking out of the top, and a container that would normally contain paint thinner. Subsequent forensic analysis of the gasoline can confirmed it contained gasoline. Testing of the other container revealed it contained a small amount of medium petroleum product, such as paint thinner. Michael's mother, Anita, who owned the residence and lived in it with Michael, testified the paint thinner was from her garage and she would never bring it into the home when she used it. Anita also testified the gasoline can did not belong to her and she had never seen it before.

The charred comforter Michael was wrapped in when she was found was located in the middle of the basement floor. Upon examination, a special agent with the State Fire Marshal's Office detected a relatively strong odor of gasoline and paint thinner on the comforter. A forensic analysis of the comforter revealed the presence of a mixture of gasoline and a medium petroleum product, such as paint thinner, both of which are fire accelerants or "ignitable liquids." Near the comforter, law enforcement found a roll of duct tape and telephone wire. The telephone cords initially attached to the rafters of the basement ceiling had been torn out and were dangling from the ceiling. A pair of sunglasses found in the basement near where Michael was found were submitted to the State crime lab for fingerprint and DNA analysis. Harper's fingerprints and DNA were found on the sunglasses. The gas-powered water heater in the basement had been moved to an extent that the gas flue that would normally exhaust gas vapors from the home was disconnected from the water heater.

Michael's bedroom and its contents suffered extensive fire damage. The mattress and box spring comprising Michael's bed were placed in front of the two windows in Michael's room, presumably to block any view of the fire from outside the residence. A fire also occurred in the master bedroom on the other side of the home. The special agent testified the fires were unrelated and had completely separate origins, thus leading him to believe that each of the separate fires was intentionally set. Furthermore, the gas stove in the kitchen had been tipped over, the control knobs on the stove were in the on position, and a candle was placed underneath the stove. All in all, the fire investigator testified there were five separate origins of the fire—the master bedroom, Michael's bedroom, the gasoline

can in the basement, the comforter Michael was wrapped in, and the area of the gas stove—all of which were intentionally set.

Law enforcement found a used condom in Michael's bedroom containing Harper's DNA on the inside and Michael's DNA on the outside. Black zip-ties were also found in Michael's bedroom. Matching zip-ties were found in Harper's home pursuant to a search warrant. The plant manager of Harper's employer testified the same zip-ties were used at the business and Harper had access to them.

Law enforcement also seized a red Oldsmobile Alero belonging to Harper's wife and known to be driven frequently by Harper. The seized Alero had a rear spoiler and a Hawaiian lei hanging from the rearview mirror. Several witnesses testified Harper was known to drive a red Alero with these characteristics. When shown pictures of the seized car at trial, McDowell and the Leiths generally testified it appeared to be the car that was in their neighborhood the morning of the fire. Upon a search of the vehicle, law enforcement found documents bearing Harper's name.

A number of individuals close to Harper at the time of these events testified they were unable to reach Harper on his cell phone the morning of the fire and thereafter. Harper did not show up for work the day after the fire and did not provide his employer with a reason for his absence. Harper was ultimately apprehended by law enforcement in Des Moines in the early morning hours of January 11. Photographs taken by law enforcement of Harper's person depict scratches or scarring on both of his hands and his face, an open wound on his right knee, and scabbing on his left knee.

Harper was charged by trial information with first-degree sexual abuse, kidnapping, murder, and arson. A jury found Harper guilty as charged. In June 2009, shortly after the supreme court affirmed his convictions, Harper filed a PCR application generally alleging ineffective assistance of his trial and appellate counsel. Over the course of the next seven and a half years, Harper specified his ineffective-assistance claims by way of multiple supplemental or amended filings. In February 2017, the district court denied Harper's application. Harper appeals. Additional facts will be set forth below as are relevant to the issues raised on appeal.

## II.     Standard of Review

Appellate review of PCR proceedings is typically for correction of errors at law, but where claims of ineffective assistance of counsel are forwarded, our review is de novo. *See Diaz v. State*, 896 N.W.2d 723, 727 (Iowa 2017). Harper must prove by a preponderance of the evidence that (1) his trial or appellate counsel failed to perform an essential duty and (2) prejudice resulted. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Lopez*, 907 N.W.2d 112, 116 (Iowa 2018). We "may consider either the prejudice prong or breach of duty first, and failure to find either one will preclude relief." *State v. McNeal*, 897 N.W.2d 697, 703 (Iowa 2017) (quoting *State v. Lopez*, 872 N.W.2d 159, 169 (Iowa 2015)). A failure to register meritless arguments does not amount to ineffective assistance of counsel. *See State v. Tompkins*, 859 N.W.2d 631, 637 (Iowa 2015).

Rulings on the admission of evidence are reviewed for an abuse of discretion, our most deferential standard of review. *State v. Dentler*, 742 N.W.2d 84, 87 (Iowa 2007); *see State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017).

### III.    Analysis

#### A.    Pro Se Claims of Ineffective Assistance of Counsel

##### 1.    *Serious Injury*

The first few pro se contentions are relative to the serious-injury element of Harper's conviction of first-degree sexual abuse.  First, Harper contends his trial or appellate counsel was ineffective in failing to challenge the district court's "overbroad definition" of serious injury.  Sessions acknowledges the propriety of the court's definition of the third element of the crime—"During the commission of sexual abuse, the Defendant caused [the victim] a serious injury," *see* Iowa Code § 709.2 (2006)—but challenges the following related instruction provided by the district court:

> Concerning Element No. 3 of [first-degree sexual abuse], the serious injury need not occur simultaneously with the commission of the sexual abuse, but may precede or follow it if the injury and the sexual abuse occur as part of an unbroken chain of events or as part of one continuous series or acts connected with one another.

We find this instruction to be a correct statement of the law and conclude trial and appellate counsel were under no duty to challenge it.  *See State v. Carter*, 602 N.W.2d 818, 822 (Iowa 1999) ("We hold that under Iowa Code section 709.2 the serious injury need not occur simultaneously with the commission of the sexual abuse in order to constitute first-degree sexual abuse under Iowa Code section 709.2.  It is sufficient if the serious injury precedes or follows the sexual abuse as long as the injury and sexual abuse occur as part of an unbroken chain of events or as part of one continuous series of acts connected with one another.").

Next, Harper contends trial and appellate counsel were ineffective in failing to challenge the sufficiency of the evidence concerning the serious-injury element

of the crime. However, this argument is premised on Harper's erroneous challenge to the jury instruction discussed above, as he only argues there was insufficient evidence "that a serious injury was cause[d] *during* the commission of a sexual abuse." As noted, "the serious injury need not occur simultaneously with the commission of the sexual abuse." *Id.* To the extent Harper challenges the sufficiency of the evidence to show the serious injury occurred as part of an unbroken chain of events or as part of a continuous series of acts connected with one another, upon our de novo review and viewing the evidence in the light most favorable to the State and the verdict, including all reasonable inferences, we conclude the serious-injury element was supported by substantial evidence and trial and appellate counsel were therefore under no duty to challenge the same. *See State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (noting the evidence in sufficiency-of-the-evidence challenges is viewed "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence"); *see also State v. Wickes*, 910 N.W.2d 554, 563 (Iowa 2018) ("[W]e will uphold a verdict if substantial evidence supports it. Evidence is substantial if, when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt." (citation and internal quotation marks omitted)). Indeed, Harper appears to concede this, as he acknowledges the "jury could find . . . the victim suffered a serious injury at *sometime*," and only argues the evidence was insufficient to show the serious injury was inflicted literally simultaneously with the act of sexual abuse.

2.      *Second-Degree-Kidnapping Instruction*

Next, Harper claims his trial and appellate counsel rendered ineffective assistance in failing to object to the district court's failure to instruct the jury on the offense of second-degree kidnapping in addition to the offense of first-degree kidnapping.  *See* Iowa R. Crim. P. 2.6(3) ("In cases where the public offense charged may include some lesser offense it is the duty of the trial court to instruct the jury, not only as to the public offense charged but as to all lesser offenses of which the accused might be found guilty under the indictment and upon the evidence adduced, even though such instructions have not been requested.").  Generally, trial courts in Iowa are required to "automatically instruct on a lesser-included offense if the legal test is met as to a greater offense that has support in the evidence."  *State v. Jeffries*, 430 N.W.2d 728, 737 (Iowa 1988).

> [U]nder the legal test the lesser offense is necessarily included in the greater offense if it is impossible to commit the greater offense without also committing the lesser offense.  If the lesser offense contains an element not required for the greater offense, the lesser offense cannot be included in the greater.  This is because it would be possible in that situation to commit the greater without also having committed the lesser.  In using this test, we look to the statutory elements rather than to the charge or the evidence.

*Id.* at 740 (citations omitted).  Kidnapping in the second degree requires proof that either "the purpose is to hold the victim for ransom" or "the kidnapper is armed with a dangerous weapon."  Iowa Code § 710.3.  Kidnapping in the first degree does not include either of these alternatives as an element of the crime.  *See id.* § 710.2.  As such, it is not impossible to commit first-degree kidnapping without also committing second-degree kidnapping.  *See Jeffries*, 430 N.W.2d at 740.  Accordingly, the court was not required to instruct the jury on the elements of

kidnapping in the second degree and, in turn, trial and appellate counsel were under no duty to raise the issue.

3.     *Confinement or Removal—Sufficiency of the Evidence*

Next, Harper appears to argue trial and appellate counsel were ineffective in failing to effectively challenge the sufficiency of the evidence concerning the confinement or removal element of first-degree kidnapping.  When assessing the sufficiency of the evidence to support a conviction, the court views "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'"  *Ortiz*, 905 N.W.2d at 180 (quoting *State v. Huser*, 894 N.W.2d 472, 490 (Iowa 2017)).  All evidence is considered, not just that of an inculpatory nature.  *See Huser*, 894 N.W.2d at 490.  "[W]e will uphold a verdict if substantial evidence supports it."  *Wickes*, 910 N.W.2d 554, 563 (Iowa 2018).  "Evidence is substantial if, 'when viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt.'"  *Id.* (quoting *State v. Ramirez*, 895 N.W.2d 884, 890 (Iowa 2017)).  If the record contains substantial evidence to support the conviction, counsels' failure to raise the issue could not have been prejudicial.  *See State v. Truesdell*, 679 N.W.2d 611, 616 (Iowa 2004).

In support of this contention, Harper provides his slanted version of the evidence and a wealth of conclusory statements in support of his position.  He provides us with no on-point legal authority to support his position other than a passive citation to *State v. Rich*, in which the supreme court stated:

> [O]ur legislature . . . intended the terms "confines" and "removes" to require more than the confinement or removal that is an inherent

incident of commission of [some other crime].[4] Although no minimum period of confinement or distance of removal is required for conviction of kidnapping, the confinement or removal must definitely exceed that normally incidental to the commission of [the other crime]. Such confinement or removal must be more than slight, inconsequential, or an incident inherent in the [other] crime . . . so that it has a significance independent from [the other crime]. Such confinement or removal may exist because it *substantially* increases the risk of harm to the victim, *significantly* lessens the risk of detection, or *significantly* facilitates escape following the consummation of the offense.

305 N.W.2d 739, 745 (Iowa 1981) (emphasis added).

A de novo review of the record evidence reveals the following. After leaving the party at the Michael residence at 4:30 a.m. on January 8, Harper returned to the home and gained entry, likely sometime after his final call to the Michael residence at 6:35 a.m. The sequence of events that occurred in the home as provided by Michael was that Harper raped her, tied her up, and then set the house on fire. The fact that Michael's jeans and the used condom containing both Michael's and Harper's DNA were found in Michael's bedroom indicates the sexual assault occurred in Michael's bedroom. The act of tying Michael up occurred thereafter in the basement of the home, an area more secluded than the main floor, as is evidenced by the fact that Michael was bound with telephone wire and duct tape, both of which were found in the basement, the telephone wire having been torn from the beams in the ceiling of the basement. Harper then engaged in several deliberate steps relative to starting the fire, concealing its detection, and facilitating his escape. Of course, it would be impossible to determine from the

---

[4] *See State v. Misner*, 410 N.W.2d 216, 223 (Iowa 1987) (concluding "the *Rich* principles prevent kidnapping charges from being prosecuted" in cases "in which a person is moved or confined wholly as part of a *murder, sexual abuse, or other crime*" (emphasis added)).

evidence in what order the steps were taken, but the evidence reveals the following steps were taken by Harper while Michael was bound and confined in the basement: (1) disabling the smoke detectors in the home; (2) retrieving the gasoline can that was foreign to the home; (3) retrieving the petroleum product from the garage of the home; (4) wrapping Michael in the comforter; (5) separately pouring gasoline and the petroleum product on the comforter; (6) igniting the comforter; (7) inserting a paper towel wick in the gasoline can and lighting the end to create a delayed explosion; (8) dislodging the gas flue on the gas-powered water heater in the basement; (9) placing a piece of furniture in front of the basement door after he finished his activities in the basement; (10) positioning the mattress and box spring in Michael's bedroom in front of the bedroom windows; (11) intentionally starting an independent fire in Michael's bedroom; (12) intentionally starting an independent fire in the master bedroom; and (13) overturning the gas stove in the kitchen, turning the control knobs to the on position, and placing a candle under the stove. Harper then left the Michael residence around 9:30 a.m., got into the nearby Oldsmobile Alero, and left the area. Harper then left Fort Dodge and was in Des Moines by mid-day.

Although a majority of the steps taken by Harper were relative to starting the fires that resulted in Michael's death, some of the steps taken were aimed at decreasing the risk of detection and facilitating Harper's escape. For example, after the sexual assault, Harper moved Michael to the basement of the home, a more secluded area than the main floor, and tied her up so she could not get away. *See State v. Robinson*, 859 N.W.2d 464, 479 (Iowa 2015) (noting Iowa case law emphasizes that binding the victim usually exceeds confinement ordinarily

incidental to another crime); *State v. Griffin*, 564 N.W.2d 370, 373 (Iowa 1997) (finding that confining a victim by ordering her to take off her clothes so she could not leave a motel room lowered the defendant's chance of detection and increased the risk of harm to the victim); *State v. McGrew*, 515 N.W.2d 36, 40 (Iowa 1994) (finding the secluded location the defendant used in confining the victim for the purpose of sexual abuse "not only lessened the risk of detection for McGrew, but also further increased the risk of harm to the victim"); *State v. Folck*, 325 N.W.2d 368, 371 (Iowa 1982) ("She was taken to a secluded spot where detection was unlikely. The remoteness of the place . . . substantially increased the risk of harm if she fought to defend herself or to escape."); *Rich*, 305 N.W.2d at 745–46 (finding sufficient evidence for confinement or removal upon the facts that defendant, among other things, took victim to a more secluded area and bound the victim's hands).

Furthermore, Michael's confinement in the basement provided Harper with the ability to take his time. With this ability, Harper disabled the smoke detectors in the home, thus preventing the likelihood that someone nearby could detect the fire before it came to full fruition; positioned the mattress and box spring in Michael's bedroom in front of the bedroom windows, presumably so a passer-by could not see into that room where one of the fires was started; and placed a piece of furniture in front of the door to the basement, obviously to further prevent Michael's escape or prevent someone from opening the door and detecting her presence. Based on the totality of the circumstances, a jury could have reasonably concluded Harper's confinement had independent significance from the murder because it significantly lessened the risk of detection. In addition, but for the

confinement, Michael would not have been in the basement when the house was set ablaze. A jury could have reasonably concluded the confinement substantially increased the risk of harm to Michael. Finally, Michael's confinement in the basement provided Harper with the ability to not only flee the scene, but to additionally flee the area and evade apprehension by law enforcement for almost three days. A jury could have reasonably concluded Michael's confinement significantly facilitated Harper's escape.

Upon our de novo review, we conclude there was sufficient evidence for the jury to reasonably conclude that Harper's confinement of Michael substantially increased the risk of harm to Michael, significantly decreased the risk of detection, or significantly facilitated Harper's escape following the consummation of the offense. Because the record contains substantial evidence to support the challenged element of the kidnapping conviction, trial and appellate counsels' failures to raise the issue did not result in prejudice to Harper. *See Truesdell*, 679 N.W.2d at 616. Counsel were not ineffective.

4. *Remaining Pro Se Claims*

As to Harper's remaining challenges relating to counsel's competency as to various other jury instructions, we find such arguments generally incoherent, lacking in specificity, unconvincing, and insufficient to identify error on appeal. Likewise, Harper's challenge to the kidnapping statutes as in violation of constitutional ex post facto prohibitions drastically misses the mark. As to these remaining claims, we agree with the district court that Harper failed to prove by a preponderance of the evidence that his counsel failed to perform an essential duty or that he suffered prejudice.

B.    First-Degree-Kidnapping Marshalling Instruction

Harper argues the district court erred in concluding his trial counsel did not render ineffective assistance of counsel in failing to object to an allegedly improper jury instruction on the crime of kidnapping. He specifically argues his counsel was ineffective in failing to recognize the kidnapping instruction did not "include the required intensifiers relative to the element of confinement and removal" and was therefore an incorrect statement of the law. *See Rich*, 305 N.W.2d at 745.

1.    *Statute of Limitations*

The State argues Harper failed to raise this argument in the district court within the statutory limitations period contained in Iowa Code section 822.3 (2009). The State points out procedendo issued in March 2009 following Harper's direct appeal, Harper's original PCR application filed in June 2009 did not raise this specific issue, and the argument was not made in the PCR court until an amended application was filed in August 2015, outside the three-year statute-of-limitations period. Indeed, in a December 2015 ruling on Harper's motion for summary judgment, the district court entered a ruling in accordance with the State's position on appeal, finding the claim is "untimely and not exempt from the three year statute of limitations." However, the court went on to minimally address the merits of the ineffective-assistance claim in denying Harper's motion for summary judgment. In the February 2017 order denying Harper's PCR application, the district court incorporated its December 2015 ruling on this issue by reference.

As Harper points out, however, the State never raised the statute-of-limitations issue as an affirmative defense in its responsive pleading to the amended application or at any other point in time during the proceedings. Instead,

it appears the district court applied it sua sponte. Because the statute-of-limitations defense was not raised by the State, it should not have been applied to preclude the claim. *See, e.g.*, *Page v. State*, No. 14-1842, 2016 WL 719243, at *2 (Iowa Ct. App. Feb. 24, 2016); *Reyna v. State*, No. 13-0126, 2014 WL 1234142, at *2 (Iowa Ct. App. Mar. 26, 2014). We proceed to the merits.

  2. *Merits*

As noted, Harper contends his counsel was ineffective in failing to recognize the kidnapping instruction did not "include the required intensifiers relative to the element of confinement and removal" and was therefore an incorrect statement of the law. On the element of confinement and removal, the jury in Harper's 2007 trial was instructed as follows:

> Confinement or removal requires more than what is included in the commission of the crime of murder.
> A person is "confined" when their freedom to move about is substantially restricted by force, threat or deception. They may be confined either in the place where the restriction began or in a place to which they have been removed.
> No minimum time of confinement or distance of removal is required. It must be more than slight. The confinement or removal must have significance apart from the other crime.
> In determining whether confinement or removal exists, you may consider whether (1) the risk of harm to Holly Michael was increased, (2) the risk of detection was reduced, or (3) escape was made easier.

As fully quoted above, the supreme court has held:

> [O]ur legislature, in enacting section 710.1, intended the terms "confines" and "removes" to require more than the confinement or removal that is an inherent incident of commission of [some other crime]. Although no minimum period of confinement or distance of removal is required for conviction of kidnapping, the confinement or removal must definitely exceed that normally incidental to the commission of [the other crime]. Such confinement or removal must be more than slight, inconsequential, or an incident inherent in the [other] crime . . . so that it has a significance independent from sexual

abuse. Such confinement or removal may exist because it *substantially* increases the risk of harm to the victim, *significantly* lessens the risk of detection, or *significantly* facilitates escape following the consummation of the offense.

*Rich*, 305 N.W.2d at 745 (emphasis added). In support of his argument that counsel was ineffective in failing to object to the instruction's lack of the *Rich* intensifiers—substantially and significantly—Harper relies on a concurring opinion in *State v. Robinson*, 859 N.W.2d 464, 487–492 (Iowa 2015) (Wiggins, J., concurring specially).

Roughly eight years after Harper's conviction, the supreme court decided *Robinson*, a case in which the defendant challenged a jury instruction nearly identical to the one employed in Harper's trial. *See Robinson*, 859 N.W.2d at 487 (Wiggins, J., concurring specially). The majority reversed Robinson's first-degree kidnapping charge on sufficiency-of-the-evidence grounds, viewing the jury instructions as the law of the case. *Id.* at 482. One justice wrote separately and asserted the confinement and removal instruction's failure to include the *Rich* intensifiers amounted to reversible error and a challenge to such a jury instruction by trial counsel "was a claim worth raising." *Id.* at 487, 492 (Wiggins, J., concurring specially). On the issue of prejudice for a claim of ineffective assistance of counsel, however, the special concurrence recognized that, notwithstanding the lack of the intensifying language, "in some cases the evidence clearly establishes the prerequisites for kidnapping independent of the underlying crimes." *See id.* at 492. We deem this to be one of those cases. In order to establish the prejudice prong of an ineffective-assistance claim, a defendant is required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

Upon our de novo review of the record, we answer that question in the negative. Assuming without deciding trial counsel had a duty to object to the instruction without the intensifiers, we cannot say Harper suffered prejudice. We find no reasonable probability the jury would have returned a not-guilty verdict on the first-degree kidnapping charge had the intensifiers been included in the instruction. Accordingly, counsel was not ineffective in not challenging the jury instruction for want of the *Rich* intensifiers.

C.      Admission of Exhibits

At the PCR trial, Harper requested the admission of a number of pro se exhibits. The State objected to the admission of the exhibits on relevance grounds, contending the exhibits were not relevant to the issues raised in the PCR proceedings. The district court agreed with the State. Thereafter, Harper attempted but was unable to coherently explain how the exhibits were relevant to the pending PCR issues. The court stood by its ruling excluding the exhibits on relevance grounds. We find the district court did not exercise its discretion on grounds clearly untenable or to an extent clearly unreasonable and affirm its ruling.

IV.    **Conclusion**

We affirm the denial of Harper's PCR application.

**AFFIRMED.**