**STATE of Iowa, Appellee,**

v.

**Tomie Lee MISNER, Jr., Appellant.**

**No. 86–780.**

Supreme Court of Iowa.

July 22, 1987.

Lloyd H. Wolf of Napier, Wright & Wolf, Fort Madison, for appellant.

Thomas J. Miller, Atty. Gen., and Ann E. Brenden and Thomas H. Miller, Asst. Attys. Gen., for appellee.

Considered by REYNOLDSON, C.J., and McGIVERIN, WOLLE, LAVORATO, and NEUMAN, JJ.

REYNOLDSON, Chief Justice.

Following jury trial, defendant Tomie Lee Misner was convicted of seven counts of second-degree kidnapping, Iowa Code §§ 710.1, .3 (1985), one count of insurrection, Iowa Code § 718.1 (1985), and one count of assault while participating in a felony, Iowa Code §§ 708.1, .3 (1985). Misner has appealed from judgment imposing sentences and we affirm.

From substantial evidence in the record, the jury could have found the following facts. January 6, 1986, an uprising involving a number of Iowa State Penitentiary inmates occurred in cell house 319. This unit housed approximately ninety inmates in a segregated, highly controlled setting. Most inmates were there primarily for prison disciplinary infractions.

The uprising began on the first floor of cell house 319 when inmate Cameron, a trustee, forced his way into the guard office and at knife point accosted officer Harper, the only guard on first floor. The

other six officers in the building were on different floors. Five of these six officers were delivering breakfasts to the inmates. The remaining officer was in the third floor guard office.

Cameron forced Harper to release inmate Misner, the defendant in this action, and inmate Darnell. Cameron then escorted Harper back to the office, still at knife point. Shortly thereafter, the inmates captured and forcibly detained, as they returned to the first floor office, the five guards on the breakfast detail.

Misner at knife point then forced captured officer Teel to release a number of inmates, including inmates Jeffries (a codefendant in the trial of this case) and Vance. Misner gave the knife to Jeffries who returned Teel to the first floor guard office.

Five of the six officers then were moved to the third floor office where the seventh correctional officer was taken hostage. Cameron, after helping to escort the five officers to third floor, returned to first floor and forced officer Hodgerson to call the shift captain and inform him the inmates had taken control of the cell house. Cameron and Misner told prison officials to stay out of the building and warned them the guards would be killed if their orders were not followed. Misner and Cameron then locked Hodgerson in a storage room where he remained until shortly before the uprising was terminated.

On third floor, with the possible exception of officer Harper, the officers' hands were bound with masking tape. While the uprising continued, they were guarded by a number of inmates, including Misner, all of whom were armed with a club or "shank."

From the third floor office where the officers were held, Misner called the shift captain. He warned the captain the officers had been taken "hostage" and would be hurt if anyone tried to get in the building. Misner also told the captain he would call back with demands in five or ten minutes. The inmates then discussed what demands to make, but before further communication with prison officials could occur the penitentiary's emergency response team stormed the building and quelled the uprising.

In this appeal Misner raises the four issues discussed in the following divisions.

I. Misner contends trial court erred in overruling his mistrial motion, grounded on a substitution of judges in the course of trial.

After eleven state witnesses had been called, the presiding judge, the Honorable William S. Cahill, became ill and was unable to continue. He subsequently was hospitalized. The Honorable David B. Hendrickson replaced Judge Cahill and completed the trial, entered judgment, and imposed sentences.

When the substitution occurred Misner moved for a mistrial, which Judge Hendrickson overruled.

Substitution of trial judges is authorized by Iowa Rule of Criminal Procedure 18(7)(b)(1). This rule provides:

> If by reason of death, sickness or other disability the judge before whom a jury trial has commenced is unable to proceed with the trial, any other judge regularly sitting in or assigned to the court, upon certifying that he or she has familiarized himself or herself with the record of the trial, may proceed with and finish the trial.

Iowa R.Crim.P. 18(7)(b)(1). Iowa's rule mirrors Federal Rule of Criminal Procedure 25(a) and thus federal interpretations of that rule are relevant.

■ Because the potential for disruption and confusion is inherent in all cases in which substitution of judges is contemplated, substantial caution must be exercised in order to insure a defendant's right to a fair trial is fully protected. Although the decision whether to substitute trial judges is committed to the sound discretion of trial court, substitution should be denied and trial delayed or mistrial granted if it reasonably is shown substitution will substantially prejudice defendant's right to a fair trial. *See State v. Sereg*, 229 Iowa 1105, 1120–21, 296 N.W. 231, 238 (1941); *see also United States v. Lane*, 708 F.2d 1394, 1396–97 (9th Cir.1983); *United States*

*v. Santos,* 588 F.2d 1300, 1303–04 (9th Cir.), *cert. denied,* 441 U.S. 906, 99 S.Ct. 1994, 60 L.Ed.2d 374 (1979); *United States v. Boswell,* 565 F.2d 1338, 1341–42 (5th Cir.), *cert. denied,* 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 110 (1978) (each holding the failure to comply fully with rule 25(a) was not grounds for reversal in the absence of a showing of prejudice).

■ After reviewing the record before us, we conclude this substitution of trial judges was appropriate. There is no question Judge Cahill was unable to continue due to illness. Judge Hendrickson, in replacing Judge Cahill, certified he had familiarized himself with the record. Before ruling on Misner's motions for acquittal and directed verdict Judge Hendrickson reviewed the testimony given by the witnesses he did not hear testify. The record reveals full compliance with rule 18(7)(b)(1).

Misner argues that, regardless of whether rule 18(7)(b)(1) was complied with, his right to a fair trial was prejudiced as a result of the substitution. We disagree.

Misner first argues Judge Hendrickson failed to consider certain factual distinctions in how the officers were seized and confined, pointing out that one of the officers was never removed from his office but was confined there for the entire period of the uprising. A review of the record, however, shows Judge Hendrickson was fully aware of this distinction when considering Misner's motions for directed verdict and acquittal and when instructing the jury. No prejudice has been demonstrated.

Misner also asserts he was prejudiced when Judge Hendrickson, without benefit of having heard all relevant testimony, denied his motion for mistrial based upon juror misconduct. Assuming Judge Hendrickson was not wholly familiar with the juror misconduct issue when he overruled Misner's mistrial motion, that failure is of no consequence. As we note in division II, Misner has failed to establish the juror's alleged misconduct affected the jury's deliberations. Thus, even if erroneous, no prejudice could have resulted from trial court's ruling.

We conclude substitution was properly made and Misner was not prejudiced by the substitution. It follows that trial court did not abuse its discretion in denying Misner's mistrial motion. *See State v. Bishop,* 387 N.W.2d 554, 564 (Iowa 1986).

II. Misner next asserts trial court erred in several rulings relating to the jury. These claims involve trial court's refusal to grant a change of venue and its denial of various juror-related mistrial motions.

Addressing the change of venue issue, we note initially that while our review of this constitutionally-based claim is de novo, reversal is required only when trial court has abused its discretion in denying the motion. *State v. Spargo,* 364 N.W.2d 203, 207 (Iowa 1985). Trial court must determine whether "such degree of prejudice exists in the county in which the trial is to be had that there is a substantial likelihood a fair and impartial trial cannot be preserved with a jury selected from that county." Iowa R.Crim.P. 10(10)(b). Specifically, Misner " 'must show either actual prejudice on the part of the jury or must show that the publicity attending the case was so pervasive and inflammatory that prejudice must be presumed.' " *State v. Wilson,* 406 N.W.2d 442, 445 (Iowa 1987) (quoting *Spargo,* 364 N.W.2d at 207); *State v. Robinson,* 389 N.W.2d 401, 403 (Iowa 1986); *State v. Gavin,* 360 N.W.2d 817, 819 (Iowa 1985).

■ In seeking to establish a presumption of prejudice, Misner presented to trial court a large number of news reports dealing with the January 6 uprising. After reviewing these reports, we find they were on the whole objective, factual reports expressing no view on Misner's guilt or innocence. Further, Misner points to nothing in the reports that is inaccurate, misleading, or obviously intended to inflame the public against him.

The news reports submitted by Misner merely detailed the events of January 6. Exposure to newsworthy events will not alone give rise to a presumption of prejudice. Additionally, to the extent particular jurors may be substantially prejudiced against a defendant, rigorous voir dire can

be trusted to expose these prejudices. *State v. Ware,* 338 N.W.2d 707, 713 (Iowa 1983); *State v. Chadwick,* 328 N.W.2d 913, 916 (Iowa 1983).

Finally, the news accounts in question were almost exclusively confined to a short period immediately following the January 6 incident. That period of hot activity was separated from trial by more than four months. Even if we were inclined to believe the tone of the articles was inflammatory, Misner has made no showing the period between the incident and trial was insufficient to dissipate any prejudice that might have been created by adverse publicity. *See Wilson,* 406 N.W.2d at 446; *State v. Johnson,* 318 N.W.2d 417, 423 (Iowa), *cert. denied,* 459 U.S. 848, 103 S.Ct. 106, 74 L.Ed.2d 95 (1982); *State v. Cornelius,* 293 N.W.2d 267, 269 (Iowa 1980).

We conclude trial court did not abuse its discretion when it denied Misner's change of venue motion.

Turning to the claim of actual jury prejudice, Misner argues trial court's failure to allow individualized and fully sequestered voir dire resulted in a jury impermissibly tainted from the outset. He alleges that during voir dire panel members made statements that inmates should have no rights and capital punishment should be reinstated. Misner also asserts statements were made concerning prior jury service in trials involving inmates and how such trials always ended in guilty verdicts. He finally contends a number of jurors knew or worked with people either employed by the Iowa State Penitentiary or involved in the January 6 incident.

Assuming remarks made during voir dire could become so inflammatory and potentially prejudicial that an entire panel could be disqualified, *see State v. Staker,* 220 N.W.2d 613, 615–17 (Iowa 1974), we have no basis on which to conclude Misner's appeal presents such a case.

Questions of jury prejudice, as well as questions concerning the need for individual voir dire, require trial court to exercise sound discretion based upon the facts and circumstances then presented. *See State v. Webb,* 309 N.W.2d 404, 414 (Iowa 1981);

*Staker,* 220 N.W.2d at 616–17. A party claiming trial court abused its discretion is obligated " 'to provide this court with a record affirmatively disclosing the error relied upon.' " *State v. Christianson,* 337 N.W.2d 502, 504 (Iowa 1983) (quoting *State v. Ludwig,* 305 N.W.2d 511, 513 (Iowa 1981)). The failure to provide an adequate record may result in waiver of the issue. *Id.* We previously have noted the importance of having voir dire reported when a motion for change of venue has been rejected. *State v. Davis,* 196 N.W.2d 885, 889 (Iowa 1972).

■ Here, with one exception discussed below, the voir dire was unreported. We have no way of determining the context in which the alleged statements were made. We hold this issue has been waived.

We note briefly Misner's complaint about a specific juror, Janet Bernard, who in his view exemplified the prejudice inherent in the jury that convicted him. The record indicates Bernard was the wife of a corrections officer at the Iowa State Penitentiary. While she disclosed this fact in her juror questionnaire, defense counsel did not discuss it with her during voir dire. Only after the jury and alternates had been selected did defense counsel actually become aware Bernard was married to a corrections officer.

Defense counsel brought this fact to the court's attention apparently hoping either for a mistrial or to strike Bernard for cause. While trial court properly could have found any objection to Bernard had been waived, particularly in light of her truthful answer on the juror questionnaire, the court allowed both prosecution and defense counsel to examine her again. This questioning showed: Bernard's husband was on vacation at the time of the uprising; he never discussed his feelings toward inmates or his work in general with his wife; Bernard believed she was impartial, had no preconceived opinion as to defendant's guilt, and could judge the case on its merits based on the evidence presented and instructions given.

Following this examination, Misner made no objection to Bernard continuing as a juror. Trial court allowed Bernard to remain on the jury and told her to report the next day for trial.

■ The following morning Misner challenged · Bernard's presence on the jury. Trial court rejected it. On appeal, Misner points to nothing in this slim record that would suggest trial court abused its discretion in refusing his belated request to strike Bernard. Misner makes no showing of prejudice and our record indicates nothing other than that Bernard was a fair and impartial juror.

Misner next raises an issue of juror misconduct. During trial, evidence was presented indicating one of the jurors might have read a newspaper report of the trial and talked with other jurors about it. These actions would have violated trial court's admonition to avoid reading news accounts of the trial and to not discuss the case with other jurors prior to submission.

■ Assuming juror misconduct was shown, the record before us is barren of any evidence suggesting juror misconduct that was calculated to or in fact did influence the jury's verdict. *See State v. Sauls,* 391 N.W.2d 239, 241 (Iowa 1986); *State v. Harrington,* 349 N.W.2d 758, 762 (Iowa 1984). Misner's motion for mistrial arising out of this asserted misconduct was properly denied by trial court.

III. We next consider Misner's challenge to his conviction on seven counts of second-degree kidnapping.

The elements necessary to establish kidnapping in the second degree are contained in Iowa Code sections 710.1 and 710.3. Section 710.1 provides:

> A person commits kidnapping when the person either confines a person or removes a person from one place to another, knowing that the person who confines or removes the other person has neither the authority nor the consent of the other to do so; provided, that to constitute kidnapping the act must be accompanied by one or more of the following:

> 1. The intent to hold such person for ransom.

> 2. The intent to use such a person as a shield or hostage.

> 3. The intent to inflict serious injury upon such person, or to subject the person to a sexual abuse.

> 4. The intent to secretly confine such a person.

> 5. The intent to interfere with the performance of any government function.

Iowa Code § 710.1 (1985). Second-degree kidnapping is committed when a defendant kidnaps any individual as that term is defined under section 710.1 while armed with a dangerous weapon. *Id.* § 710.3.

In this case, the State's kidnapping charges, as developed through trial and incorporated in the instructions, were based on two of the five specific intent subsections of Iowa Code section 710.1. First, the State charged Misner kidnapped the guards with the intent to use them as shields or hostages. *Id.* § 710.1(2). Second, the State claimed Misner kidnapped the guards with the intent to interfere with the performance of any government function (*i.e.,* "to interfere with the performance of the warden and his staff in the operation of the penitentiary"). *See id.* § 710.1(5).

In appealing his convictions on all seven kidnapping counts, Misner makes no complaint relating to trial court's instructions. Rather, relying almost exclusively on our case of *State v. Rich,* 305 N.W.2d 739 (Iowa 1981), and its progeny, Misner argues there is no substantial evidence in this record to support a finding the guards were sufficiently "confined" or "removed" to sustain a charge of kidnapping.

In *Rich,* defendant was convicted of first-degree kidnapping arising out of an incident that also resulted in charges of sexual abuse and robbery. The kidnapping count charged that Rich had kidnapped his victim with "[t]he intent to ... subject [her] to ... sexual abuse." *See* Iowa Code § 710.1(3) (1979); *Rich,* 305 N.W.2d at 742. Recognizing that every sexual abuse case involved some degree of confinement or

removal of the victim, we were called upon to determine what level of confinement or removal was necessary to distinguish the charge of kidnapping with the intent to commit sexual abuse from the separate crime of sexual abuse.

We determined the legislature, in adopting the kidnapping statute, "intended the terms 'confines' or 'removes' to require more than the confinement or removal that is an inherent incident of commission of the crime of sexual abuse." *Rich*, 305 N.W.2d at 745. We then delineated the standards by which a jury could determine whether the evidence demonstrated a confinement or removal sufficient to support a charge of kidnapping.

These standards provide:

1. No minimum period of confinement or distance of removal is required for conviction of kidnapping.

2. The period of confinement or distance of removal must exceed what is normally incidental to the commission of sexual abuse.

3. The confinement or removal must have significance independent from the act of sexual abuse itself in one of the following ways:

a. Substantially increase the risk of harm to the victim.

b. Significantly lessen the risk of detection.

c. Significantly facilitate escape following the consummation of the sex abuse offense.

*Id.* These standards are unquestionably the law in Iowa today with respect to cases involving a kidnapping charge generated out of a sexual abuse charge. *See, e.g., State v. Hardin,* 359 N.W.2d 185, 189–90 (Iowa 1984); *State v. Folck,* 325 N.W.2d 368, 371 (Iowa 1982).

Misner argues the "merely incidental" rule adopted in *Rich* should apply to all cases in which an underlying crime inherently involving some period of confinement or some movement is coupled with a charge of kidnapping. He contends the confinement and movement of the guards in this situation were merely incidental to the charges of assault and insurrection. It fol-

lows, argues Misner, that the confinement or removal element of the kidnapping charges cannot be met and those charges must be dismissed.

The State responds that substantial evidence was presented from which the jury could find the actions taken with respect to the guards were distinct and independent from those actions giving rise to assault and insurrection charges. The State's primary argument, however, is that the kidnappings charged here are not limited by the "merely incidental" test of *Rich.*

The State's position is that Misner's actions from the start were designed to seize the guards and use them as hostages or shields. The State asserts that from the outset Misner intended to kidnap the guards for the purpose of interfering with the operation of the Iowa State Penitentiary. In short, the State argues that kidnapping itself is the underlying crime and, unlike *Rich* and similar cases, is not the fallout from other criminal activities.

Particularly with respect to hostages, the State's position finds strong support in other jurisdictions. On similar facts the Michigan Supreme Court, in *People v. Adams,* 389 Mich. 222, 205 N.W.2d 415 (1977), concluded that in hostage situations *any movement* was sufficient to establish kidnapping. *Id.* at 238, 205 N.W.2d at 422. Other courts have recognized the " 'merely incidental' rule does not apply in situations where the purpose in confining or moving another person is to use that person as a hostage." *Mobley v. State,* 409 So.2d 1031, 1036 (Fla.1982).

Similarly, the New Jersey Court of Appeals, in another prison uprising case, stated:

Defendant's reliance on several recent cases which have held that an asportation and detention of a victim is not kidnapping where it is merely incidental to an underlying crime, e.g. robbery or rape, and does not substantially increase the risk of harm to the victim, is misplaced. Here, the underlying crime was kidnapping. Moreover, even those cases and the authorities which recommend the

adoption of that rule recognize that the new rule they espouse has no application to situations—such as exist here—where the victim was held as a hostage. In such cases, any unlawful or forcible removal and detention will suffice.

*State v. Wooten*, 135 N.J.Super. 6, 11–12, 342 A.2d 549, 552 (1975), *aff'd*, 73 N.J. 317, 374 A.2d 1204 (1977).

The conflict between the State and Misner arises from the difficulty in clearly identifying when a kidnapping occurs and is properly charged. At one extreme is the classic kidnapping case in which an individual is abducted for the express purpose of holding the person for ransom or as a hostage. In such cases kidnapping is the central crime and any confinement or movement is sufficient to support the charge. The "merely incidental" rule can have no role when there is no underlying crime.

At the other extreme is the case in which a person is moved or confined wholly as part of a murder, sexual abuse, or other crime. In such cases the movement or confinement has no independent significance, but rather is only that confinement or movement necessarily inherent in the type of crime committed. We conclude the *Rich* principles prevent kidnapping charges from being prosecuted in such cases.

Between these extremes, we have cases such as this one. Here, the confinement and movement occurred as part of a ninety-minute uprising. A number of charges were brought as a direct result of the disturbance. At trial, Misner argued any confinement was merely incidental to the insurrection and could not support an independent kidnapping charge. There was substantial evidence to support this claim.

On the other hand, the State at trial argued the central purpose of the uprising was to take hostages and to disrupt state activities and that the other crimes of assault and insurrection were merely incidental to the kidnapping. The State contended in trial court that because the kidnappings were themselves the central purpose of the uprising the jury should be instructed any movement or confinement was sufficient to support the charges of kidnapping. The record contained substantial evidence to support the State's view.

In cases like this that fall on neither end of the continuum, a jury reasonably could find either (1) that the confinement or movement was merely incidental to some other underlying crime; (2) that some underlying crime was involved but the confinement or movement had significance independent of that charge and thus kidnapping was supported; or (3) that kidnapping was itself the central crime and did not simply arise in the course of other criminal activity.

■ In such cases, trial court should instruct the jury with respect to all three possibilities. A proper *Rich* instruction, modified to fit the potential underlying charges, will properly present to the jury the first two alternatives. With respect to the third alternative, the jury should be instructed that if it determines defendant's activity was undertaken with the central purpose of holding an individual hostage or as a shield or interfering with the performance of any government function, any movement or confinement intended to accomplish this purpose will be sufficient to support the confinement or removal element of kidnapping.

Other cases involving different portions of the kidnapping definitional standard may also under appropriate circumstances support such a charge. Those cases might include incidents involving ransom or an attempt to confine a person secretly. *See* Iowa Code §§ 710.1(1), (4) (1985).

Here, trial court instructed only as to the first two alternatives. Because substantial evidence supported the State's claim the third alternative was implicated (*i.e.*, kidnapping was the central purpose), trial court should have instructed the jury accordingly.

The instructions given without objection by Misner became the law of the case and properly presented to the jury the requirements of *Rich*. The State was required to show the confinement or movement was

not merely incidental to the assault or insurrection charges.

 We conclude substantial evidence supports the jury's determination the confinement or movement was not merely incidental to the assault or insurrection. Because substantial evidence supports the jury's verdict and because the jury instructions favored Misner's position, we have no reason to reverse his kidnapping convictions because trial court refused to give an instruction less favorable to Misner. We affirm Misner's kidnapping convictions.

IV. Misner also attacks his conviction for insurrection. He challenges the sufficiency of the evidence to support his conviction and also contends the insurrection statute is unconstitutionally vague.

In relevant part Iowa's insurrection statute provides:

> An insurrection is three or more persons acting in concert and using physical violence against persons or property, with the purpose of interfering with, disrupting, or destroying the government of the state ... or to prevent any executive ... officer or body from performing its lawful function.

Iowa Code § 718.1 (1985). With respect to the question of sufficiency, Misner asserts no substantial evidence was presented from which the jury could find "three or more inmates [were] acting in concert." *Id.* We disagree.

 Throughout the guards' testimony three inmates were linked repeatedly: Cameron, Jeffries, and Misner. All three inmates were at various times in possession of the same knife used to threaten the guards. Further, these three inmates were involved in the decision to move the officers from first floor to third floor and, in general, cooperated together throughout the entire uprising. We hold the evidence was sufficient to support a finding Cameron, Jeffries, and Misner acted in concert during the uprising.

Misner's additional unsupported contention that Iowa Code section 718.1 is unconstitutionally vague is answered in *State v. Wagner*, 410 N.W.2d 207, 215 (Iowa 1987).

We find this contention without merit.

The judgment of the district court is affirmed.

AFFIRMED.