# IN THE COURT OF APPEALS OF IOWA

No. 17-1426
Filed December 19, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**DENNIS EDGAR CHAMBERLAIN,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Buchanan County, Joel Dalrymple, Judge.

Defendant appeals his convictions for attempt to commit murder, kidnapping in the second degree, and two counts of intimidation with a dangerous weapon with intent, as well as the extension of a no-contact order. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee.

Considered by Potterfield, P.J., Doyle, J., and Blane, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**BLANE, Senior Judge.**

Following a jury trial, Dennis Chamberlain appeals his convictions, sentences, and judgments for attempt to commit murder, kidnapping in the second degree, and two counts of intimidation with a dangerous weapon with intent. He challenges the district court's jury instructions regarding intoxication, reasonable doubt, and the definition of "confinement," as well as the extension of the no-contact order for a period longer than five years. Based upon our review, we affirm Chamberlain's convictions for attempt to commit murder and two counts of intimidation with a dangerous weapon with intent. We reverse his conviction for kidnapping in the second degree and remand for retrial. We also reverse a provision of the extension of the no-contact order and remand for correction.

I.     Background facts.

Robin Chamberlain (Robin)[1] and Dennis Chamberlain (Chamberlain) were married and lived together in Aurora, Iowa. On October 8, 2016, Chamberlain became upset about something Robin's mother had said, which caused Robin and Chamberlain to argue on and off for the rest of the day. Sometime between 6:00 and 8:00 p.m., Chamberlain left the house and walked to a nearby bar. Robin went to bed.

Robin woke up when Rick, who owned the nearby bar, yelled for somebody to come and help him with Chamberlain. When Robin came into the living room, she saw Chamberlain "was staggering around, fell on the couch," and "calling [her] a bitch and telling [her] that he wanted a divorce and he was going to take

---

[1] By the time of trial, Robin had divorced Dennis and returned to her last name of Olsen.

everything." Rick told Robin that Chamberlain "had drank two drinks up at the bar that night." Robin tried to help Chamberlain, but he kept berating her so Robin went back to bed.

Sometime later, Robin heard and then saw Chamberlain enter her bedroom. He was no longer staggering, and she did not smell an odor of alcohol. Chamberlain walked around the bed to where Robin usually slept and "grabbed ahold of [Robin's] hair and twisted it." Chamberlain held a pistol against her head and pointed it in her face, telling her that "he was going to kill [her]." He fired two shots, one into the ceiling and another into a closet door; the gun was close enough to Robin's head that she could feel the discharge through her hair.

After Chamberlain fired those shots, he told Robin to "call the kids and tell them goodbye." She first called Ashley, Chamberlain's daughter. She told Ashley, "Your dad is going to kill me, Ashley. He's got a gun to my head." Ashley said, "Just say yes or no. Do you want me to call the cops?" Robin answered, "Yes." Chamberlain ordered Robin to make similar calls to the other children. Meanwhile, Ashley called 911 and reported that her father was holding a gun on Robin.

Multiple officers responded to the Chamberlain residence following the dispatcher radio notice. Sergeant Joseph Schwinghammer of the Buchanan County Sheriff's Department was one of the deputies who approached the house. He knocked on the door to try to speak with Chamberlain, but there was no response. As the deputies turned to walk away, they heard two shots fired just seconds after Sergeant Schwinghammer moved away from the door. It was immediately obvious that the gunfire was coming from inside the house, near the door. Three more shots were fired—the fourth and fifth shots struck a fence "[j]ust

to [the] left" of Deputy Matthew Cook. Iowa State Patrol Trooper Justin Kane, whose military training enabled him to recognize a "whizzing" sound indicated bullets were flying past him, testified the shots were "in close proximity" to his head.

At one point, Chamberlain called 911. He reported that officers had arrived, and he referred to it as a "hostage situation." Chamberlain told the 911 operator that he was going to release Robin and her dog. He then stated that officers needed to get off the porch or "they're gonna eat f-----g bullets." Chamberlain then moved Robin from the bedroom to the bathroom. She had not smelled any alcohol on Chamberlain nor heard him slurring his speech. Although Chamberlain stumbled and fell onto the couch when he first arrived home with Rick, Robin did not see Chamberlain stumbling or falling when he awakened her, threatened her, dragged her into the bathroom, or pulled her from the bathroom and led her to the front door. To Robin, Chamberlain did not appear confused about where he was or what was going on.

Josh—Chamberlain's son—arrived at the scene right before his father started firing more shots. Josh used his cell phone to call his father, and his father answered. Sergeant Schwinghammer used Josh's phone to talk to Chamberlain. Chamberlain did not seem to be at all confused about what was happening, and his speech was not slurred. Josh convinced his father to speak with Trooper Stephen Dudak, a trained hostage negotiator.

Trooper Dudak asked about Robin's condition and requested Chamberlain let her go. Trooper Dudak recalled Chamberlain was very defiant, insisting that neither Robin nor he was coming out, and stating a number of times that officers would have to shoot him or he was going to shoot himself. Based on his language,

Dudak did not believe Chamberlain was going to give up. Chamberlain also told Dudak that no officers should try to come in or he would shoot them. When Dudak said they had no idea what charges he was facing, Chamberlain responded: "Don't bullshit me. I know that I'm going to prison if I come out," and "[a]fter holding my wife hostage and after firing rounds, I believe my fate has been sealed." Dudak was certain that Chamberlain understood the situation and "was in complete control."

The trooper believed that Chamberlain responded more favorably when he spoke with his son, Josh, so he gave the phone back to Josh and coached him on what to say. Eventually, Chamberlain pulled Robin out of the bathroom and told her that he would let her go. As they approached the front door, Chamberlain fired a shot through the door. Robin and her dog then fled out the door at approximately 1:00 a.m. on October 9. She was crying, shaking, and appeared to be in shock.

After Robin's departure, Trooper Dudak continued to negotiate with Chamberlain and observed his emotions started to "come down tremendously," like at the end of a "roller coaster ride emotionally." Trooper Dudak said that his negotiations with Chamberlain involved back-and-forth discussions that enabled him to confirm Chamberlain understood what he was saying "[v]ery clearly." Eventually, Chamberlain agreed to come out and surrender. Dudak told Chamberlain the arresting officers would give him orders and he should "[l]isten to everything they have to say and everything will end just fine." Around 2:00 a.m., Chamberlain exited the residence and followed the officers' directions. The arresting officers, who were in close physical proximity to Chamberlain, did not smell any odor of alcohol and noted he was coherent, not confused, able to speak

clearly and without difficulty, able to walk without assistance, and sorrowful for his actions.

Mary Astleford was a corrections officer at the Buchanan County Jail. She was familiar with intoxicated persons as she had booked intoxicated arrestees on prior occasions. She observed Chamberlain following his arrest, and he did not appear to be intoxicated—he was not disoriented or confused, was able to follow instructions and answer questions, and appeared to understand why he was in jail. She observed Chamberlain did not have an odor of alcohol or any other typical indicator of intoxication. Allan Nunemaker was the other corrections officer who participated in booking Chamberlain. Like Astleford, Nunemaker did not observe an odor of alcohol or any other sign that Chamberlain was intoxicated.

At trial, Chamberlain testified and gave his own account of the October 8 events. He stated that while at the bar he consumed four double shots of whiskey and three bottles of beer as chasers. That night, sometime after he returned to the house, he recalls being in his bedroom, taking his gun, and putting it to his temple with the intention to shoot himself. He wanted to ask Robin why she had argued with him, so he went to her bedroom. He got mad and shot into the ceiling. At no time during his testimony did Chamberlain claim his actions were due to being so intoxicated that he did not know what he was doing. He recalled firing a second shot at the closet a few minutes later but specifically not at Robin, stating, "I didn't even plan to shoot anywhere near her."

Chamberlain went into the living room because officers were pounding on the front door. He shot through the living room window but testified he was not shooting at anyone because he could not see outside as the shade was drawn.

As he walked back toward the bedroom where Robin remained, he shot out through the kitchen windows. When he saw lights outside, he figured it was the cops, so he had Robin go into the bathroom: "I put her in there because there's no windows, and if they were gonna maybe shoot, she would be safe."

Chamberlain went back to the kitchen. He saw Sergeant Schwinghammer outside. He testified, "I could have shot him . . . . I did not do it. I was not trying to hurt anybody." He yelled at the officers to get off the porch and then shot up through the kitchen ceiling. Then he again shot through the kitchen windows. Chamberlain recalled that Schwinghammer called him first. It made him mad that Schwinghammer claimed to "know" him. Chamberlain wanted the officers to go away; he was not going to hurt anyone. His son Josh got on the phone and wanted him to release Robin. As Chamberlain testified: "I did calm down for a while somewhat." Then, as he talked to Trooper Dudak, "I wasn't thinking," he testified. "I was enraged," he added, as he wanted answers from Robin.

II.     Procedural background.

On October 18, 2016, the State filed a trial information against Chamberlain charging him with eight counts arising from the events of October 8. At arraignment, Chamberlain pleaded not guilty and waived his right to a speedy trial. On December 5, Chamberlain filed a notice of intoxication defense, and on February 13, 2017, he filed a notice of diminished responsibility defense.[2] On June

---

[2] On appeal, Chamberlain is not challenging the failure to instruct related to diminished responsibility. *See State v. Aguilar*, 325 N.W.2d 100, 102–03 (Iowa 1982) (reiterating holding that when the theory of diminished responsibility is based on intoxication, it is sufficient to instruct on intoxication alone).

28, the State filed an amended and substituted trial information removing counts V through VIII.

The jury trial also commenced June 28. The jury found Chamberlain guilty of attempt to commit murder (count I), a class "B" felony in violation of Iowa Code section 707.11 (2016); kidnapping in the second degree (count II), a class "B" felony in violation of section 710.3; and two counts of intimidation with a dangerous weapon with intent (counts III and IV), class "C" felonies in violation of section 708.6. Each of the offenses required proof of specific intent.

Chamberlain filed a combined motion for judgment of acquittal and motion for new trial. The district court denied the motions and held a sentencing hearing. The court sentenced Chamberlain to indeterminate terms of imprisonment not to exceed twenty-five years with a mandatory 70% minimum on counts I and II, and indeterminate terms of imprisonment not to exceed ten years with five-year mandatory minimums on counts III and IV. The court ran the sentences concurrently with one another. The court also imposed a $1000 fine, court costs, and surcharges on counts III and IV. Finally, the court extended the no-contact order against Chamberlain as to Robin "for a period of 5 years or the maximum term of confinement, whichever is greater." Chamberlain filed a timely notice of appeal.

III.    Discussion.

A. Whether the trial court erred in denying Chamberlain's request for an intoxication defense jury instruction?

Prior to trial, Chamberlain timely filed a notice of intoxication defense. Defense counsel also submitted to the court a set of requested jury instructions,

including one on the intoxication defense. At the close of evidence, the court conducted a hearing regarding the jury instructions. The court determined that there was not substantial evidence of Chamberlain's intoxication to support instructing the jury on the intoxication defense and declined to give it. On appeal, Chamberlain claims this was error and entitles him to a new trial.

Absent a discretionary component, a court's refusal to give a requested jury instruction is reviewed for correction of errors at law. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016). A trial court is required to submit a requested intoxication-defense instruction if there is substantial evidence in the record to support that defense. *See State v. Guerrero Cordero*, 861 N.W.2d 253, 260–61 (Iowa 2015), *overruled on other grounds by Alcala*, 880 N.W.2d at 708 n.3.

Our supreme court has recently discussed the intoxication defense and when it applies. *See id.* at 259. Simply asserting the defense or requesting a jury instruction does obligate the trial court to submit the intoxication defense to the jury. *Id.* at 260 ("Courts are required to instruct the jury on the law for all material issues raised by the evidence in a case. It ordinarily 'must instruct on a defendant's theory of a defense provided the defendant makes a timely request, the requested theory of defense instruction is supported by the evidence, and the requested instruction is a correct statement of law.'" (citations omitted)). The court is only required to give the instruction when it is supported by substantial evidence. *Id.* at 260–61. Additionally, the evidence at trial supporting intoxication must rise to the level discussed in *Guerrero-Cordero* to warrant submission of the defense:

> We have traditionally required a high level of intoxication to support a finding of no specific intent.

> Mental disability, arising from the use of intoxicants, is a matter of degree. Partial drunkenness does not make impossible the formation of said criminal object. Therefore, the "intoxication" or "drunkenness" must be to the extent that the designing or framing of such purpose is impossible.

*Id.* at 259 (quoting *State v. Patton*, 221 N.W. 952, 952 (1928)). Stated another way, "The law does not specify the degree or the percentage of intoxication essential to sustain this defense, but it does require that it be such as to render the accused incapable of the requisite specific intent." *Id.* (quoting *State v. Wilson*, 11 N.W.2d 737, 745–46 (Iowa 1943)). Evidence that a defendant has been drinking liquor or is "merely" intoxicated is not enough to invoke the defense. *See id.* at 259–60. The defendant "will not be absolved of criminal responsibility if he still possesses mental capacity to entertain the intent." *Id.* at 259 (citation omitted).

To be entitled to an intoxication defense instruction Chamberlain needed to provide substantial evidence to support the theory he was "so intoxicated that [he] could no longer reason and was incapable of forming a felonious intent," which would negate all specific intent elements. *See id.*; *see also State v. Linzmeyer*, 79 N.W.2d 206, 208–09 (Iowa 1956) ("The defense of drunkenness is available to the defendant only when the degree of intoxication is so great as to deprive him of the power to form a specific intent." (citation omitted)).

Evidence at trial regarding Chamberlain's intoxication defense was that he is an alcoholic but had not had a drink for at least a year before these events. He takes various medications for health issues, which include hydrocodone, morphine, Lyrica, and Lorazepam. There was no testimony as to the strength,

dosage, or when Chamberlain last took any of the medications before the incident or what, if any, effect such drugs would have interacting with alcohol.

Chamberlain further testified that on this date he walked to a local bar sometime between 6:00 and 8:00 p.m. While he was at the bar, according to Chamberlain, he consumed four double shots of whiskey and had three bottles of beer. There is nothing in the record as to Chamberlain's height or weight. There is also no evidence as to the specific time frame when these drinks were consumed. When he fell over a leg of a bar stool at around 10:00 p.m., the bar owner—Rick—decided to give Chamberlain a ride home.

When he got Chamberlain inside the residence door, Rick called for Robin to assist. Chamberlain was staggering and fell onto the living room couch. Chamberlain testified that he considered himself intoxicated when he returned home from the bar. Robin testified that Rick said Chamberlain had two drinks at the bar that night. According to Robin, due to his health issues, Chamberlain's legs sometimes would give out. She also did not smell alcohol about him, and Chamberlain did not slur his speech after he returned home.

After Robin returned to her bedroom, she initially heard him stumbling around, but after he came into her bedroom, and for the rest of the night, she did not observe him stumbling or falling when he was moving around the residence. During their marriage, Robin had seen Chamberlain drink to the point of intoxication. This night he did not seem confused to her; he knew where he was and what was going on.

During that evening, Chamberlain talked on the phone with his daughter, Ashley. When Ashley called the 911 dispatcher the first time, she requested a

"welfare check" on her father because she felt he was intoxicated. The events took place from approximately 10:00 p.m., when Chamberlain returned home, until 1:00 a.m., when Robin came out of the residence. Chamberlain finally surrendered at about 2:00 a.m. Chamberlain testified he felt he was intoxicated up until the point he turned himself in and was handcuffed but described it as "a little bit intoxicated."

Chamberlain's criminal conduct started that evening when he entered Robin's bedroom with the gun. Chamberlain fired two shots. Robin thought he was going to kill her. Chamberlain's own testimony was that he was not going to shoot her. Such testimony evidences he was capable of forming a specific intent—whether to shoot Robin or not. However, Chamberlain's testimony he did not intend to shoot Robin is contradicted by what occurred next—Chamberlain telling Robin to call their children and tell them goodbye. Robin took this to mean Chamberlain was going to kill her. This conduct shows Chamberlain's thought process: that he was going to shoot Robin and she would want one last opportunity to talk to the children or that he meant to scare Robin into believing she was saying goodbye one last time. In either event, Chamberlain exhibited a thought process where he was not so intoxicated that he did not know what he was doing; he could form a specific intent.

Chamberlain's testimony in conjunction with other testimony further evidences his intoxication level was not sufficient to require the trial court to instruct the jury on the intoxication defense. Chamberlain recalled his actions in the residence from first confronting Robin in the bedroom until he released her and later surrendered. He testified where he went, what he observed, where he was when he fired each shot, the direction he shot, and the reason he fired the shot.

He also testified that he moved Robin from her bedroom to the bathroom for her safety as it has no windows.

Throughout these events, Chamberlain spoke to officers as well as the 911 dispatcher. The phone calls were recorded and played for the jury. They evidenced that Chamberlain understood the situation and processed information, showing he was not intoxicated to the point of not being able to comprehend what he was doing. In ruling on the intoxication instruction, the trial court specifically referenced the recordings, noting Chamberlain did not sound intoxicated and the content of his speech showed he was comprehending, logical, and, therefore, capable of forming specific intent.

The officers, particularly Trooper Dudak, testified about his conversations with Chamberlain during that evening, which showed Chamberlain was making decisions and taking action based on thought processes that included forming specific intent. Chamberlain consumed alcohol earlier in the evening and he may have been somewhat intoxicated, but from the start of his criminal conduct—when he entered Robin's bedroom with a gun—until he surrendered, the evidence established he was not so intoxicated that he was incapable of forming specific intent. The trial court properly ruled Chamberlain was not entitled to a jury instruction on the intoxication defense.

B. Whether the district court erred in rejecting Chamberlain's requested reasonable-doubt instruction?

Our standard of review here is again absent a discretionary component; a court's refusal to give a requested instruction is reviewed for correction of errors at law. *See Alcala*, 880 N.W.2d at 707.

The trial court gave the following reasonable-doubt instruction to the jury:

> The burden is on the State to prove the defendant guilty beyond a reasonable doubt.
> A reasonable doubt is one that fairly and naturally arises from the evidence or lack of evidence produced by the State.
> If, after a full and fair consideration of all the evidence, you are firmly convinced of the defendant's guilt, then you have no reasonable doubt and you should find the defendant guilty.
> But if, after a full and fair consideration of all the evidence or lack of evidence produced by the State, you are not firmly convinced of the defendant's guilt, then you have a reasonable doubt and you should find the defendant not guilty.

Chamberlain's counsel requested the court give the Iowa State Bar Association uniform jury instruction.[3]  On appeal, Chamberlain argues the reasonable-doubt instruction given by the trial court was error because it does not contain the "hesitate to act" language that was in his requested instruction.  *See Victor v. Nebraska*, 511 U.S. 1, 20–21 (1994).  However, Chamberlain acknowledges that the instruction given by the trial court has been approved by the Iowa Supreme Court in *State v. Frei*, 831 N.W.2d 70, 75–79 (Iowa 2013),

---

[3] The Iowa State Bar Instruction No. 100.10 (2017) reads:
> The burden is on the State to prove (name of defendant) guilty beyond a reasonable doubt.  A reasonable doubt is one that fairly and naturally arises from the evidence in the case, or from the lack or failure of evidence produced by the State.
> A reasonable doubt is a doubt based upon reason and common sense, and not the mere possibility of innocence.  A reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it.  However, proof beyond a reasonable doubt does not mean proof beyond all possible doubt.  If, after a full and fair consideration of all the evidence, you are firmly convinced of the defendant's guilt, then you have no reasonable doubt and you should find the defendant guilty.
> But if, after a full and fair consideration of all the evidence in the case, or from the lack or failure of evidence produced by the State, you are not firmly convinced of the defendant's guilt, then you have a reasonable doubt and you should find the defendant not guilty.

*overruled on other grounds by Alcala*, 880 N.W.2d at 708 n.3.  He asks on appeal that we find it error to give the reasonable-doubt instruction used by the trial court here.  We note that *Victor* pre-dated *Frei.*

Our supreme court has held that failure to include the "hesitate to act" language is not error and has approved the instruction used here.  *See Frei*, 831 N.W.2d at 76, 79 (considering the same instruction used here and concluding, "We believe [the instruction] adequately expressed—within due process parameters articulated in *Victor*—the extent of certitude the jury must possess to convict a defendant of a crime in this state.  Accordingly, we conclude the district court did not err when it instructed the jury on reasonable doubt").  As we have stated many times, we leave the task of overruling precedent to our supreme court.  *See, e.g.*, *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990) ("We are not at liberty to overturn Iowa Supreme Court precedent.").

C. Whether Chamberlain was denied effective assistance of counsel and a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 10 of the Iowa Constitution when counsel failed to object to the "confinement" instruction?

Chamberlain contends his trial attorney rendered ineffective assistance when he failed to object to the jury instruction defining the confinement required for a kidnapping conviction.  Specifically, Chamberlain complains he was prejudiced by the instruction because it omitted language relating to the degree of risk, harm, and ease of escape required to find confinement.  He maintains he is therefore entitled to a new trial as to the kidnapping count.

We review claims involving ineffective assistance of counsel that have their basis in the Sixth Amendment to the United States Constitution de novo.  *State v.*

*Thorndike*, 860 N.W.2d 316, 319 (Iowa 2015). We ordinarily preserve such claims for postconviction-relief proceedings. *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005). We will resolve the claims on direct appeal only when the record is adequate. *Id.* Here, the State admits, and we agree, the trial record is sufficient to resolve Chamberlain's claim on direct appeal.

To prevail on a claim of ineffective assistance of counsel, a claimant must satisfy the *Strickland* test by showing "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* (citation omitted).

When claiming ineffective assistance based on failure to object to a jury instruction, "the instruction complained of [must be] of such a nature that the resulting conviction violate[s] due process." *Thorndike*, 860 N.W.2d at 321 (alterations in original) (citation omitted). Failure to recognize an erroneous instruction and preserve error breaches an essential duty. *See State v. Hopkins*, 576 N.W.2d 374, 379–80 (Iowa 1998) (finding counsel failed to perform an essential duty when he failed to object to a jury instruction that incorrectly stated the law because counsel was not aware of the current state of the law).

The marshalling instruction regarding the second-degree kidnapping count required the State to prove the following:

> (1) On or about the 8th day of October, 2016, the defendant confined Robin Chamberlain;
> (2) The defendant did so with the specific intent to:

(a) Use Robin Chamberlain as a shield or hostage, or

(b) Inflict serious injury upon Robin Chamberlain.

(3) The defendant knew he did not have the consent or authority of Robin Chamberlain to do so.

(4) The defendant was armed with a dangerous weapon at the time he confined Robin Chamberlain.

The trial court's confinement instruction read:

A person is "confined" when her freedom to move about is substantially restricted by force, threat or deception. The person may be confined either in the place where the restriction began or in a place to which she has been removed.

No minimum time of confinement or distance of removal is required. It must be more than slight. The confinement must have significance apart from the offense of intimidation with a dangerous weapon with intent.

In determining whether confinement exists, you may consider whether:

1. The risk of harm to Robin Chamberlain was increased.

2. The risk of detection was reduced.

3. Escape was made easier.

Chamberlain argues that the numbered paragraphs in this instruction should have included what have been referred to as "intensifiers"—"substantially" and "significantly"—as discussed in *State v. Rich*, 305 N.W.2d 739, 745 (Iowa 1981).[4] Chamberlain maintains the instruction on confinement should have read as follows:

The confinement or removal must have significance independent from the offense of intimidation with a dangerous weapon with intent:

1. Substantially increase the risk of harm to the victim.

2. Significantly lessen the risk of detection.

3. Significantly facilitate escape following the consummation of the sex abuse offense.

*See Rich*, 305 N.W.2d at 745.

---

[4] The requirement to add "substantially" to paragraph number (1) and "significantly" to paragraphs (2) and (3) is referred to the "tripartite test." *See, e.g.*, *State v. Robinson*, 859 N.W.2d 464, 475 (Iowa 2015).

The purpose of the intensifiers is to prevent defendants from being convicted of kidnapping when the defendant, while perpetrating a different underlying crime, confines or moves a person in a way that is incidental to the underlying crime. *See Robinson*, 859 N.W.2d at 475 ("After canvassing the cases, we came down firmly on the side of the cases adopting the incidental rule. We recognized every assault, rape, and robbery involves some act of intentional confinement or movement. We reasoned . . . the legislature did not intend to give prosecution a choice of two penalties of such a disparate nature for sexual abuse." (citations omitted)). "[T]he legislature intended that the kidnapping statute be applicable only in situations in which the 'confinement or removal definitely exceeds that which is merely incidental to the commission of [an underlying crime.].'" *Id.* (citation omitted).

Here, based on the evidence introduced at trial, the jury could have concluded[5]:

> (1) that the confinement or movement [of Robin] was merely incidental to [the crime of intimidation with a dangerous weapon with intent]; (2) that some underlying crime was involved but the confinement or movement had significance independent of that charge and thus kidnapping was supported; or (3) that kidnapping was itself the central crime and did not simply arise in the course of other criminal activity.

---

[5] The State claims that this was, as Chamberlain himself proclaimed, a hostage situation, and therefore "the kidnapping is the central crime and any confinement or movement is sufficient to support the charge. The 'merely incidental' rule can have no role when there is no underlying crime." *State v. Misner*, 410 N.W.2d 216, 223 (Iowa 1987). Thus, the State concludes the trial court was not required to include the intensifiers in the confinement instruction, the instruction given was a correct statement of the law, and Chamberlain's trial counsel had no duty to object. While the jury could agree with the State's theory, it was not required to do so.

*Misner*, 410 N.W.2d at 223. "In such cases, [the] trial court *should instruct* the jury with respect to all three possibilities." *Id.* (emphasis added). And counsel's failure to object to the instruction without the intensifiers was a breach of an essential duty. *See Hopkins*, 576 N.W.2d at 379–80. Moreover, although the jury could have found that Chamberlain's confinement and removal of Robin was not merely incidental to the crime of intimidation with a dangerous weapon with intent, we cannot say the record contains overwhelming evidence to compel the jury to reach that result. *See Moss v. State*, No. 15-1624, 2016 WL 5408092, at *6 (Iowa Ct. App. Sept. 28, 2016) (determining trial counsel provided ineffective assistance to the defendant when failing to object to the instruction on confinement that did not include the *Rich* tripartite intensifiers). This error has "undermine[d] our confidence in the verdict." *State v. Madsen*, 813 N.W.2d 714, 727 (Iowa 2012). Thus, Chamberlain has met his burden of establishing prejudice, and he is entitled to a new trial on the charge of kidnapping in the second degree. *See id.* at 717.

D. Whether the district court imposed an illegal sentence by extending a no-contact order beyond five years?

Chamberlain contends the court imposed an extension of time regarding the no-contact order beyond that authorized by statute. We review whether the sentence imposed is beyond the court's authority for errors at law. *State v. Morris*, 416 N .W.2d 688, 689 (Iowa 1987).

At sentencing, the court extended the no-contact order "for a period of 5 years or the maximum term of confinement, whichever is greater." Iowa Code section 664A.5 provides that upon a defendant's conviction for a public offense the court shall terminate or modify the no-contact order and "may . . . continue the no-

contact order already in effect *for a period of five years from the date the judgment is entered.*"  (Emphasis added.)

The imposition of any portion of a sentence must be statutorily authorized. *See State v. Louisell*, 865 N.W.2d 590, 597 (Iowa 2015).  "The legislature possesses the inherent power to prescribe punishment for crime, and the sentencing authority of the courts is subject to that power."  *State v. Ohnmacht*, 342 N.W.2d 838, 842 (Iowa 1983) (citation omitted).  "A sentence not permitted by statute is void."  *Id.*  "The court may correct an illegal sentence at any time."  Iowa R. Crim. P. 2.24(5)(a).  This includes no-contact orders entered without statutory authority.  *See State v. Sanchez*, No. 13-1989, 2015 WL 4935530, at *5 (Iowa Ct. App. Aug. 19, 2015) ("If contained in the sentencing order, [the no-contact order] is part of the sentence that may be challenged at any time, whereas those matters that follow the entry of a final judgment are collateral and must be separately appealed." (citing *State v. Formaro*, 638 N.W.2d 720, 727 (Iowa 2002))).

On appeal, the State concedes the provision extending the no-contact order to the "maximum term of confinement," if it is greater than five years, is not authorized by statute and must be eliminated.  Although we reverse and remand for retrial Chamberlain's conviction for kidnapping in the second degree, we leave in place his conviction for intimidation with a dangerous weapon with intent as to Robin, which supports an extension of the no-contact order.  No resentencing hearing is required; this matter can be addressed through issuance of a corrected order.  *See, e.g.*, *State v. Boruch*, No. 14-1757, 2016 WL 4801325, at *6 (Iowa Ct. App. Sept. 14, 2016).  Thus, we remand to the district court for entry of a corrected no-contact order that eliminates the offending language.

IV.     Conclusion.

We affirm Chamberlain's convictions for attempt to commit murder and two counts of intimidation with a dangerous weapon with intent.  We reverse his conviction for kidnapping in the second degree and remand for a retrial.  We also reverse the no-contact order which imposed an extension not authorized by law and remand for entry of an order that conforms with Iowa Code section 664A.5.

**AFFIRMED IN PART; REVERSED IN PART AND REMANDED.**

Doyle, J., concurs; Potterfield, P.J., concurs specially.

**POTTERFIELD, Presiding Judge** (concurring specially).

I write separately to disagree with the majority's conclusion there was insufficient evidence to submit Chamberlain's proposed instruction on the defense of intoxication. The majority fails to make the distinction between the requisite amount of evidence necessary to determine whether a trial court should submit an affirmative defense to the jury and the amount of evidence necessary to prove the defense. *Compare State v. Watts*, 244 N.W.2d 586, 589–90 (Iowa 1976) (finding evidence of chronic alcoholism, consumption of beer, and memory lapses sufficient for instruction even where police officers opined defendant was not intoxicated), *with State v. Guerrero Cordero*, 861 N.W.2d 253, 257, 262 (holding the evidence insufficient to warrant the instruction when it established the defendant's consumption of beer but nearly all witnesses opined he was not intoxicated). The evidence at trial here included consumption of alcohol, staggering, stumbling, and history of alcoholism, with the opinion of his daughter that he was intoxicated. Taken in the light most favorable to Chamberlain, *see Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 712 (Iowa 2016), the evidence exceeded "mere intoxication" and the court, when requested, should have instructed on Chamberlain's theory of defense. *See Guerrero Cordero*, 861 N.W.2d at 259 ("Mere intoxication is not sufficient." (citation omitted)).

However, the evidence of Chamberlain's ability to form specific intent was overwhelming, and I cannot find Chamberlain suffered prejudice from the court's failure to instruct on Chamberlain's defense to the intent elements of those crimes. *See State v. Plain*, 898 N.W.2d 801, 817 (Iowa 2017) ("Error in giving or refusing

to give a jury instruction does not warrant reversal unless it results in prejudice to the complaining party." (citation omitted)).