# IN THE COURT OF APPEALS OF IOWA

No. 23-1082
Filed December 18, 2024

**SHARON L. KELLOGG,**
        Petitioner-Appellant,

**vs.**

**BRIAN KELLOGG, DEREK DAY, DIANE M. KELLOGG, and D & K RANCH, L.C.,**
        Respondents-Appellees.
_____

        Appeal from the Iowa District Court for Chickasaw County, Alan Heavens, Judge.

        A transferee of a membership interest in a limited liability company appeals the district court's dismissal of her petition to vacate a deed conveying real estate owned by the company.  **AFFIRMED.**

        Christopher F. O'Donohoe and Trevor J. Hurd of Elwood, O'Donohoe, Braun & White, LLP, New Hampton, for appellant.

        David H. Skilton and Christine B. Skilton of Cronin, Skilton & Skilton, P.L.L.C., Nashua, for appellees.

        Heard by Greer, P.J., and Ahlers and Badding, JJ.

**BADDING, Judge.**

After forty-six years of marriage, Sharon Kellogg believed that the property owned by her late husband, Bruce Kellogg, was her property, "just like my property was his property." This included a membership interest Bruce owned in D & K Ranch, L.C., a limited liability company. The district court disagreed and dismissed Sharon's petition to vacate a deed conveying the company's only asset—a 100-acre farm—to one of its members after Bruce's death. The court ruled that because Sharon "was never a manager or a member and the land was sold for more than market value," she "has no legal right, or any legitimate grounds, to complain." The judge who reached this ruling stepped into the case after a different judge paused the first day of trial so that Sharon could respond to an undisclosed appraisal of the farm.

Sharon appeals, claiming (1) there was no "valid basis for substitution" of judges under Iowa Rule of Civil Procedure 1.1802(1), and the court erred in (2) failing to recognize her "member status as Bruce Kellogg's personal representative" under Iowa Code section 489.504 (2022), (3) holding that the managing member did not breach his fiduciary duty to her or violate the operating agreement by selling the farm, (4) approving a discounted value for her interest in the company, and (5) failing to consider her oppression claim. We affirm.

## I.      Background Facts and Proceedings

Sharon Kellogg's husband, Bruce, died in January 2020. When Bruce died, he owned a membership interest in D & K Ranch, L.C.—a limited liability company—with his brother, Larry Kellogg; Larry's son, Brian Kellogg; and their family friend, Derek Day. The four had pooled their money together years earlier

to buy a farm in Chickasaw County, where the group hunted, fished, and spent time with their families. There is a cabin on the property, along with two fully stocked ponds, timbers, and cropland, although none of the ground was being farmed because it was enrolled in the Conservation Reserve Program (CRP) until 2025.

The company's articles of organization, which were filed with the secretary of state in 2001, provided that the company would dissolve upon the death of one of its members. The articles further provided that the company would be "managed by the managing member." The operating agreement named Larry as the company's managing member and was later modified to provide:

> That in the event of the death of one of the parties, or the desire of one of the parties to sell his interest in the subject real estate, that the remaining parties be given the first opportunity to buy the fractional interest of the party who has died or has indicated the desire to sell, at the fractional appraised value, determined as of the date of death or the date the party has given written notice to the remaining parties of his desire to sell. The value shall be determined by either the value of the subject real estate set by the Chickasaw County Assessor or by independent appraisal. Said option shall be exercised within sixty (60) days of death or notice of intent by the party desiring to sell.

In accordance with these governing documents, Larry began the process of dissolving the company and winding up its activities after Bruce's death. In a March 2020 letter, Larry notified Sharon that the company would be dissolved and offered to pay Bruce's estate $65,000 for his membership interest.[1] Sharon refused this offer. So, in April, Larry obtained an appraisal of the farm, which set its estimated value at either $408,000 or $420,000, depending on whether certain

---

[1] Bruce's will was admitted to probate without present administration.

acres were designated as wetlands. Larry did not share the appraisal with Sharon, although he did show it to Brian and Derek.

The next month, the company sold the farm to Brian for $360,000 and Larry mailed Sharon a check for $86,465.26—one-fourth of the net proceeds. Included with the check was a copy of the closing statement and articles of dissolution. Sharon returned the check, notifying Larry that if he did not "obtain a deed from Brian to either D & K Ranch, L.C. or to Derek Day, Sharon Kellogg, Larry Kellogg and himself as tenants in common on or before May 15," she would sue to vacate the deed. Larry's attorney returned the check to Sharon through her counsel, writing "the actions of the manager, Larry Kellogg, were . . . approved by the surviving members of the Company," although that was not required by the operating agreement. In closing, Larry's attorney stated: "I hope this brings closure to this private family matter. I know how difficult this must be for Sharon, but she was never a member of this Company and that is something each of the members agreed to." Larry passed away later that year.

The hoped-for closure did not happen. In May 2022, Sharon followed through with her suit to vacate the deed conveying the farm to Brian, having never cashed the check for one-fourth of the net proceeds. She named Brian, Derek, Diane Kellogg (Larry's widow), and the company as defendants. Sharon alleged that Larry "did not follow the procedures established by the Operating Agreement" for the sale of the property and that he "breached his duty to the other members of the limited liability company by selling said property to his son Brian Kellogg." The defendants answered Sharon's petition, denying its allegations, and later sought

summary judgment. The district court denied the summary judgment motion, and the case proceeded to trial in January 2023.

Sharon and Bruce's daughter, Malinda Trende, testified first. She described a conversation that she witnessed between her father, Larry, and Brian a few weeks before her father's death: "[T]hey were talking about the cabin and kind of the equity that they had together, and Dad had expressed that—to Larry and Brian that—he said, I want my share of the cabin and everything to go to my son Ross." Sharon confirmed that was Bruce's wish. She also testified that while she had never seen an appraisal of the property, she believed it was worth between $8000 to $8500 per acre.

After her testimony, Sharon rested her case, and the defendants moved for a directed verdict. They resurrected many of the same arguments from their summary judgment motion, including that Sharon was neither a member of the company nor owed any fiduciary duty by Larry as its managing member. In response, Sharon argued that Larry owed a duty of loyalty to all the members, which did not end at Bruce's death but continued to her as "the holder of [Bruce's] interest until it is disposed of by either winding up or sale." The defendants disagreed, urging that as a transferee of Bruce's membership interest, Sharon was not "entitled to vote or have any managerial interest or do anything as regards to the company. She only was entitled to [an] accounting and to the distribution of the proceeds upon winding up of the business . . . ."

The district court denied the motion for directed verdict, reasoning the question before it was not whether Sharon "had the right to vote" or whether "the other members could ratify a sale of the property without any input from her; it's

whether [Larry's] choice to sell the asset at less than fair market value constitutes a fraudulent transfer or a breach of his fiduciary duty." The court concluded,

> I mean, basically, I don't think just because Bruce died that the remaining members can simply say, sorry, Sharon, you don't have an interest anymore; we're going to get rid of the assets and we're not going to give you any interest in it; we're going to sell them for far less than market value. I don't know if that's true or not. I'm waiting to hear your evidence that this was a sale at fair market value. And if that's true, then we don't have an issue.

Because the case was in equity, the court offered to suspend the proceedings so that the land could be appraised. The defendants then informed the court that an appraisal had been performed but not provided to Sharon. The court granted Sharon's request to continue the trial until she had time to review the appraisal, depose its author, and possibly obtain her own appraisal.

The trial resumed five months later, in May 2023, in front of a different judge. The new judge informed the parties that the former judge contacted him "yesterday and said that he would not be returning to this case. So that gives us a somewhat unusual procedural history now that the case has been started under one judge and will be finished under another." To address that unusual situation, the court proposed the following:

> I will take the transcript [from the first day] into account, the exhibits into account, and I think that would catch me up to speed as to what's happened so far. I did also mention to [Sharon's attorney] that if he wanted to re-call any witnesses if he felt like some of what happened would be a credibility determination in terms of listening to a witness, that I would be willing to grant him that.

Sharon's attorney objected to the substitution of judges, arguing "there is absolutely no substitute for the Court hearing a witness testify in person." The court denied the motion but reiterated, "if there are credibility aspects of the case,

I would be happy to hear witnesses again for the limited purpose of, you know, this is a factual dispute and you need to actually see these witnesses live."

With that issue out of the way, the court asked Sharon's attorney "whether there is anything further that the petitioner plans to present today or would like to present at a future date." Counsel informed the court that while the proceedings were suspended, Sharon had the property appraised but her appraiser, Thomas Terwilliger, was unavailable for trial that day. At Sharon's request, the court admitted Terwilliger's appraisal as an exhibit and left the record open to submit his deposition. The defendants then presented their case, starting with their appraiser Vernon Fredrick Greder Jr.

Greder testified that his first appraisal in April 2020 set the farm's fair market value at $408,000 or $420,000 to account for some of the cropland that was in CRP possibly being designated as wetlands: "[T]he 408 figure was a figure that if it's designated wetland. The 420 is the figure that if it's not designated a wetland." That appraisal did not factor in a minority interest in the farm, which Greder was asked to do in a second appraisal that he performed in March 2023. In that appraisal, Greder testified he determined the fair market value "[f]or an undivided minority interest" was "$349,840.60 for the whole, with one-fourth of that value being $87,457.65." He then critiqued Terwilliger's appraisal, which had set the farm's fair market value at $550,000. Greder noted that, among other issues, some of the comparable farms Terwilliger used in his appraisal were not enrolled in CRP like the subject property was. He also noted that Terwilliger did not make "any allowances for the obviously below average drainage of the tillable ground" or account for the "primary well that services the cabin is 1250 feet west."

Picking up on those issues, Brian testified that he and the surviving members of D & K Ranch sold the property to him for less than its first appraised value because they knew there were wetlands on the property. They also considered that in Greder's first appraisal, "the pasture ground was considered farmland and there's several building sites that are buried in there so his appraisal on that part wasn't quite right because you can't farm stuff that's not buried very deep." As for the well issue, Brian explained, "There's a water line that runs from that to the cabin and that is buried and cannot be farmed over otherwise you would rip up the tile line." In sum, Brian testified "this is not farmland that is high quality," having been out of production for decades. Derek Day, the other member of D & K Ranch, also testified at trial and agreed with Brian that the farm was sold for its fair market value of $360,000.

In rebuttal, Sharon and her daughter testified again. Their testimony largely tracked what they said on the first day of trial, though Sharon lowered her opinion on the total value of the property. She broke it down at $320,000 for forty acres of cropland, $120,000 for twenty acres of CRP, and $150,000 for thirty acres of timber, maintaining the property was "prestige for deer hunting, turkey hunting, fishing, [and] the ponds are stocked." In his deposition, which was provided to the court about a month after trial, Terwilliger testified that he reached a slightly lower value for the farm than Sharon after adjusting for the tillable acres that had been lying fallow.

Upon considering this evidence, the district court denied Sharon's petition to vacate the deed conveying the farm to Brian. The court reasoned that under the operating agreement, Sharon "was an 'assignee' who only inherited Bruce's

right to distributions, not Bruce's membership rights."  As a result, the court concluded she

> had no right to see Greder's appraisal, no right to determine the market value of the real estate, and no right to object to or veto the sale to Brian for a price that every actual member of D & K Ranch agreed to.  Sharon was only entitled to Bruce's one-fourth share of the sale proceeds that Larry attempted to give her.

Alternatively, the court found that even if Sharon were owed some type of fiduciary duty, her claim still "fail[ed] because the real estate was sold for more than market value," according to Greder's second appraisal.  Sharon appeals.

## II.    Standard of Review

Because this action was tried in equity, the parties agree that our review is de novo.  *See* Iowa R. App. P. 6.907.  In equity cases, "we give weight to the district court's factual findings for institutional and pragmatic reasons."  *Barkalow v. Clark*, 959 N.W.2d 410, 418 (Iowa 2021).

## III.   Analysis

### A.    Judge Substitution

Sharon first challenges the substitution of judges after the trial was continued.  She argues that Iowa Rule of Civil Procedure 1.1802(1) does not allow substitution to occur unless the first judge has died or is disabled.  That rule provides:

> In the event of the death or disability of a judge in the course of a proceeding at which the judge is presiding . . . any other judge of the district may hear or act upon the same, and, if in the judge's opinion the judge can proceed with the matter . . . the judge shall do so; otherwise, the judge may order a continuance, declare a mistrial, order a new trial of all or any of the issues, or make such disposition of the matter as the situation warrants.

Iowa R. Civ. P. 1.1802(1). Because the first judge was not dead or disabled, Sharon contends there was no valid basis for substitution under rule 1.1802(1).

Sharon is correct that the record does not show why the first judge was replaced. The judge who took over on the second day would only confirm that the other judge "is still alive, he's not on any type of appellate court, and he has not retired. . . . He hasn't filed any type of recusal order in the case, but I know he's not here today and I know he's told me he's not returning to this case." *See Taylor v. State*, 632 N.W.2d 891, 896 (noting that "disability" under the rule "can encompass a recusal"). But even though a triggering event for substitution is absent, we conclude Sharon is not entitled to relief because she suffered no prejudice. *See State v. Misner*, 410 N.W.2d 216, 218 (Iowa 1987) (collecting cases holding that the failure to fully comply with the comparable federal rule was not grounds for reversal in the absence of prejudice).

The successor judge read the transcript from the first day of the trial, reviewed all the exhibits offered without objection by each side, and gave Sharon the opportunity to recall witnesses. *Cf. In re Marriage of Seyler*, 559 N.W.2d 7, 9 (Iowa 1997) (finding substitution inappropriate where the successor judge did not preside at trial, hear any of the testimony, or review the transcript). Sharon took advantage of that opportunity, recalling her daughter and providing additional testimony herself. Although that testimony was presented in rebuttal to the defendants' evidence, the court gave Sharon some leeway before she testified:

> [G]iven the unique nature of this, again, I will be reading the transcript so I will take that into account, but if you felt like there was part of your January presentation that would be different if I heard it live as opposed to if I read it in the transcript, I also wanted to give you that right if you wanted it.

We accordingly reject Sharon's inaccurate complaint that "the evidence was considered in a bifurcated manner; that is, the plaintiff's case was limited to review of the transcript while the defendant's entire case was presented via live testimony."

We also reject Sharon's complaint that the successor judge improperly decided credibility issues from the transcript of the first day of trial. *See id.* ("In a case where the resolution of a material issue requires a determination as to the weight and credibility of testimony, due process requires that the trier of fact hear all of the evidence necessary to make a meaningful evaluation." (citation omitted)). In support of this complaint, Sharon points to the court's finding that her "appraiser 'was not credible' and that the live testimony of the Defendant's appraiser, as well as Brian Kellogg, Derek Day, and Larry Kellog[g] was 'much more accurate and realistic.'" The successor judge did make those credibility findings. But Sharon chose to submit testimony from her appraiser by deposition rather than having him testify in person, even though that was something the court considered:

> If I feel like I'm going to need to hear from the plaintiff's expert before I make a ruling, you know, then we're going to have to come back to hear that.
> . . . .
> [PLAINTIFF'S ATTORNEY]: Your Honor, I had thought to present that witness's testimony by deposition so that wouldn't require you . . . to be in Chickasaw County for that.
> COURT: Okay. I am happy to come back, but if you want to do it that way and the defendants agree to present the testimony that way?
> [DEFENDANTS' ATTORNEY]: That's fine, Your Honor.

Because Sharon was not prejudiced by the substitution of judges, we find no reason to reverse on this assignment of error.

**B.** **Status as Deceased Member's Personal Representative**

Sharon next claims that under Iowa Code section 489.504, "a personal representative acting to settle the estate of a deceased member is not, as the district court concluded, simply a successor in interest, but rather is entitled to act as a member for the limited purpose of settling the estate." We disagree.

To answer this question, we first look to the limited liability company's operating agreement, "with the statutory provisions governing where the operating agreement does not otherwise provide." *Felt v. Felt*, No. 18-0710, 2019 WL 2372321, at *3 (Iowa Ct. App. June 5, 2019); *accord* Iowa Code § 489.110(1)–(2).[2] Section 7.01 of the operating agreement provides:

> Subject to any restrictions on transferability under applicable law, or contained elsewhere in this Agreement, or in the articles of agreement each Member may assign some or all of the Interest of such Member. *Such assignee shall become a substituted member* ("Substituted Member") in the Limited Liability Company entitled to all the rights and benefits under this Agreement *only if all of the Members consent to the assignment in writing* or approve of the assignment by a vote[] taken a[t] a meeting of the Members, which consent or approval may be withheld in the absolute discretion of any of the Members. *An assignee who is not a Substituted Member shall only be entitled to the distributions the assignor would be entitled.*

(Emphasis added.)

This provision follows "[o]ne of the most fundamental characteristics of LLC law"—"its fidelity to the 'pick your partner' principle." Rev. Unif. Ltd. Liab. Co. Act § 502, cmt. Under this principle from the Revised Uniform Limited Liability Company Act (RULLCA), which Iowa adopted in Iowa Code chapter 489, the statute's default rules "forbid a member from transferring that member's *status* as

---

[2] Effective January 1, 2024, these provisions were transferred to section 489.105. *See* 2023 Iowa Acts ch. 152, § 143(1)(g).

a member without consent from the other members of the company." 5 Matthew G. Doré, *Iowa Practice Series: Business Organizations* § 13:28(1) (Nov. 2023 update) [hereinafter Doré]; *accord* Iowa Code § 489.401(4)(c). The other members of D & K Ranch did not consent to Sharon becoming a member of the company. But it is possible "for a member of a limited liability company to transfer the member's *transferable interest* in the company," although the statute "severely restricts the rights of a transferee of a member's transferable interest." *Id.*; *see also* Rev. Unif. Ltd. Liab. Co. Act § 502, cmt. ("A member's rights in a limited liability company are bifurcated into economic rights (the transferable interest) and governance rights (including management rights, consent rights, rights to information, rights to seek judicial intervention."); *Felt*, 2019 WL 2372321, at *4 ("[M]embership is not the same as possession of a transferable interest.").

Section 489.102(24) defines a member's "transferable interest" as the right "to receive distributions from a limited liability company in accordance with the operating agreement." To that end, section 489.502(2) provides that a person to which all or part of a transferable interest has been transferred—otherwise known as a transferee—"has the right to receive, in accordance with the transfer, distributions to which the transferor would otherwise be entitled."[3] *Accord* Iowa Code § 489.102(25) (defining "transferee"). "This is a pure financial right and entails no management rights," Doré § 13:28(1), as is made clear by section 489.502(1)(c):

---

[3] The parties do not dispute that Bruce's ownership units transferred to Sharon at his death. *See* Iowa Code §§ 489.501 ("A transferable interest is personal property."); 633.350 (providing in relevant part that title to a decedent's personal property passes to the person to whom it is devised by will).

> Subject to section 489.504, [a transfer] does not entitle the transferee to do any of the following:
>
> (1) Participate in the management or conduct of the company's activities.
>
> (2) Except as otherwise provided in subsection 3, have access to records or other information concerning the company's activities.

*Accord* Rev. Unif. Ltd. Liab. Co. Act § 502, cmt. ("Mere transferees have no right to participate in management or otherwise intrude as the members carry on the affairs of the limited liability company and their activities as members."). The exception in section 489.502(3) applies in "a dissolution and winding up of a limited liability company," during which a transferee "is entitled to an account of the company's transactions only from the date of dissolution."

Under these provisions, the "rights of a mere transferee are quite limited— *i.e.*, to receive distributions . . . and, if the LLC dissolves and winds up, to receive specified information pertaining to the LLC from the date of dissolution." *Id.* Yet Sharon argues these limited rights are expanded by section 489.504 when a transferee is acting as a personal representative of a deceased member. Neither the applicable statutory provisions nor the out-of-state case law Sharon cites support her position.

Section 489.504 states that "[i]f a member dies, the deceased member's personal representative . . . may exercise the rights of a transferee provided in section 489.502, subsection 3, and, for the purposes of settling the estate, the rights of a current member under section 489.410." Sharon seizes on this last phrase, arguing that it permits her "to manage and protect the decedent-member's LLC interest by exercising the managerial rights retained by the member prior to his death." She might be right if section 489.504 ended after "current member."

But it doesn't. Instead, the statute limits the rights the personal representative can assert in settling the estate to the "rights of a current member *under section 489.410.*" Iowa Code § 489.504 (emphasis added).

Turning then to that provision, section 489.410 details the right of members, managers, and dissociated members to information from the company. *See* Rev. Unif. Ltd. Liab. Co. Act § 504, cmt. ("The estate and those claiming through the estate are transferees, and as such they have very limited rights to information."). It does not give Sharon the ability to exercise the managerial rights that Bruce had before he died, as she argues on appeal. The Ohio case that Sharon relies on— *Holdeman v. Epperson*, 857 N.E.2d 583 (Ohio 2006)—does not help her argument. Unlike here, the statute at issue in *Holdeman* provided that

> if a member who is an individual dies or is adjudged an incompetent, the member's executor, administrator, guardian, or other legal representative may exercise all of the member's rights as a member for the purpose of settling the member's estate or administering the member's property, including any authority that the member had to give an assignee the right to become a member.

Ohio Rev. Code Ann. § 1705.21(A).[4] With this unqualified language, the court in *Holdeman* held that "an executor of the estate of a deceased member of a limited liability company has all rights that the member had prior to death, for the limited purpose of settling the member's estate or administering his property." 857 N.E.2d at 588. Our statute is not so expansive.

For these reasons, we conclude that the district court did not err in failing to recognize Sharon's member status as Bruce's personal representative under

---

[4] This statute has since been repealed.

section 489.504. She was instead a transferee (referred to as an "assignee" under the operating agreement) with limited rights to information from the company.

### C.    Breach of Fiduciary Duty

Because we agree with the district court that Sharon did not step into Bruce's shoes as a member of the company after his death, we reject her related claim that the court "erred in holding that Larry Kellogg did not breach his fiduciary duties" of loyalty and care under section 489.409(8)(a). As Sharon recognizes, those duties are owed by a manager in a manager-managed company to the company and the other members.[5] *See* Iowa Code § 489.409(1), (8)(a); *accord Urbandale Best, LLC v. R & R Realty Grp., LLC*, No. 15-2015, 2017 WL 363239, at *4 (Iowa Ct. App. Jan. 15, 2017). The statute does not extend those duties to transferees, and Sharon does not argue,[6] or provide us with any authority, for such an extension. *Cf. Wilson v. Wernowsky*, 846 S.E.2d 101, 110–11 (Ga. Ct. App. 2020) (concluding that the duty of good faith and fair dealing under a comparable limited liability act did not extend to a transferee, who was a widow of a deceased member); *Nelson v. Alliance Hospitality Mgmt., LLC*, No. 11 CVS 3217, 2013 WL 4506222, at *8 (N.C. Sup. Ct. Aug. 20, 2013) ("The plain language of the statute anticipates that members and managers may owe fiduciary duties to one

---

[5] Neither party has addressed whether D & K Ranch was a member-managed or manager-managed limited liability company. Because the company's status does not affect our resolution of the issues before us, we will assume, as the parties seem to, that the company was manager-managed.

[6] The judge who heard the first day of trial noted that under article 6.04(f) of the operating agreement, the manager shall "have fiduciary responsibility for the safekeeping and use of all funds and assets of the Limited Liability Company." Sharon does not make any argument under that article on appeal.

another or to the LLC, but does not anticipate fiduciary duties being owed to an assignee.").

### D. Breach of Operating Agreement

Sharon next claims that the district court "erred in holding that Larry Kellogg acted in accord with D & K Ranch L.C.'s operating agreement," citing the "contractual obligation of good faith and fair dealing" in Iowa Code section 489.409(4). She does not, however, address whether she can assert such a claim against the company and its members in her status as a transferee. And the cases above suggest that she cannot. *See, e.g.*, *Wilson*, 846 S.E.2d at 109–10. Assuming without deciding that she can, we conclude there was no breach of the provisions cited by Sharon.

Sharon argues that by selling the company's only asset to his son Brian without the prior written consent of its members, Larry breached articles 6.07 and 6.03(e) of the operating agreement. Article 6.07 provides that the manager

> on behalf of the Limited Liability Company, may enter into contracts with himself/herself or any of his/her Affiliates, provided that any such transactions shall be on terms no more favorable to the Manager or his/her Affiliates than generally afforded to unrelated parties in a similar transaction. . . .

The operating agreement's definition of an "affiliate" does not include a family member of the manager,[7] so we conclude this provision was not breached.

---

[7] Article 1.02 defines an "affiliate" as,
> in the case of any Person (the "Specified Person"), any other Person (a) that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the Specified Person, or (b) that owns or controls 10% or more of the outstanding voting securities of the [S]pecified Person, or (c) that is an officer, director, employee or agent of, partner in, or trustee of, or serves in a similar capacity with respect to, the Specified [P]erson or

As for article 6.03(e), Sharon is correct that it prohibited Larry from "sell[ing] all or substantially all of the assets of the Limited [L]iability Company other than in the ordinary course of business" "without the prior written consent of the Members holding at least a majority of the Units." *See also* Iowa Code § 489.407(3)(d)(1). But under article 12.02, upon dissolution of the company—which was triggered by Bruce's death—Larry had the exclusive authority to wind up its affairs. That authority included the "full power and authority to sell the Limited Liability Company's assets, or any part thereof." Since Larry sold the farm to wind up the company's affairs upon its dissolution, we conclude that article 6.03(e) did not apply. Even if it did, the surviving members of the company testified that they approved of the sale. *See id.* § 489.409(6) ("All of the members of a member-managed or a manager-managed limited liability company may authorize or ratify, after full disclosure of all material facts, a specific act or transaction that otherwise would violate the duty of loyalty."). We accordingly reject this assignment of error as well.

### E.    Discounted Value

For her fifth claim on appeal, Sharon asserts the district court "mistakenly reasoned that the $360,000 sale price was a fair discounted market rate because the 100-acre farm was subject to each member's fractional LLC interest." On that issue, the court found that "[a]ssuming arguendo that D & K Ranch owed Sharon, as an assignee, some type of fiduciary duty, Sharon's case still fails because the

---

an Affiliate of the Specified [P]erson or (d) of which the Specified Person is an officer, director, employee, agent, partner or trustee, or serves in a similar capacity.

real estate was sold for more than market value." The court reasoned that the defendants and their appraiser, Greder,

> all had a much more accurate and realistic view of what D & K Ranch's real estate was truly worth. It was appropriate to take into account fractional interests because that's exactly how the property would be sold if Sharon prevailed in this case given that she won't sell her fourth of the real estate to the same person and for the same price as the other three owners would and did.

Sharon challenges this conclusion, arguing that "[w]hile it is true that each member of the LLC retains a personal property interest *in the limited liability company itself*, it does not follow that such personal interest affects the real property interests of the LLC." As a result, she contends "it is clear that the fractional interests retained by D & K Ranch L.C.'s members corresponded to their *interest in the company*, not in the property or assets held by the company." The defendants simply respond that because Sharon was a transferee, she "had no right to dispute the valuation of her husband's fractional interest in the real estate or the company."

We need not address this issue because, as explained above, we agree with the district court that Sharon, as a transferee, was not owed any of the fiduciary duties she cites on appeal. Sharon does not rely on any other theory to support her request to vacate the deed transferring the farm to Brian as below value, aside from her claim that the court "erred in failing to consider [her] oppression claim." *See id.* § 489.701(1)(e);[8] *see also Cosgrove v. Woodbury Cnty.*, No. 00-0116, 2001 WL 194421, at *1 (Iowa Ct. App. Feb. 28, 2001) ("The

---

[8] This statute was amended effective January 1, 2024. *See* Acts 2023 (90 G.A.) ch. 152, H.F. 655, § 53, eff. Jan. 1, 2024.

appeal in an equity case is not a trial de novo, but is limited to de novo review of identified and preserved error." (citing *Hyler v. Garner*, 548 N.W.2d 864, 870 (Iowa 1996)).

"Generally, we will not decide an issue presented to us on appeal that was not presented to *and decided by* the district court." *DuTrac Cmty. Credit Union v. Hefel*, 893 N.W.2d 282, 293 (Iowa 2017) (emphasis added). While Sharon raised an oppression claim in the district court proceedings, the court (as her argument suggests) did not rule on it. "If a party raises an issue and the district court does not rule on it, the party must file a motion to request a ruling on the issue." *Id.* Because Sharon did not do so, error on this claim was not preserved for our review.

## IV. Conclusion

Having found no reversible error on the claims presented to us, we affirm the district court's ruling dismissing Sharon's petition to vacate the deed conveying the property owned by the dissolved limited liability company to one of its members.

**AFFIRMED.**